## REDFEARN v. AMERICAN CENTRAL INS. CO.

No. 15851—Opinion Filed Jan. 12, 1926.

Rehearing Denied Feb. 16, 1926.

### Insurance—Fire Policy—Nonliability Under Riot Clause.

In a suit to recover on a standard form fire insurance policy, where the defense is based upon what is known as the "riot clause," the burden is upon the insurer to prove that the loss was caused directly or indirectly by the riot. If such burden is sustained, and the plaintiff fails to produce evidence reasonably tending to sustain his theory that the fire was the result of some other intervening cause, it is not error for the trial court to direct a verdict for the defendant.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Tulsa County; Edwin R. McNeill, Judge.

Action by William Redfearn against American Central Insurance Company. Judgment for defendant, and plaintiff appeals. Affirmed.

Fred Ptak, Hayson & Lukenbill, and Ward & Chase, for plaintiff in error.

Geo. B. Rittenhouse, F. A. Rittenhouse, Frank E. Lee, and John F. Webster, for defendant in error.

Opinion by RAY, C. This suit is to recover on fire insurance policies on a theater building and a hotel building located in the negro section of the city of Tulsa, conceded to have been in force at the time the buildings were totally destroyed by fire. The defense was that the loss was caused directly or indirectly by a riot. Each of the policies contained this clause:

"This company shall not be liable for loss caused directly or indirectly by invasion, insurrection, riot, civil war or commotion, or military or usurped power, or by order of any civil authority. * * *"

The court directed a verdict for the defendant and entered judgment on the verdict, from which plaintiff appeals. The only assignments of error argued by plaintiff are that the court erred in directing the verdict for the defendant and in overruling plaintiff's motion for a new trial. The only question to be decided is whether there was sufficient evidence tending to sup-

port the plaintiff's theory of the case to go to the jury.

The undisputed evidence shows that on the 31st day of May, 1921, it was rumored in and around the city of Tulsa that a negro then confined in jail would be lynched that night. The negroes residing in the northeast part of the city of Tulsa, known as the negro section, became excited over the rumored lynching, and a great many of them armed themselves for the declared purpose of preventing the lynching. By nine or ten o'clock in the evening, the streets about the courthouse in Tulsa were congested with white people, men, women, and children. A number of armed negroes in automobiles drove around the courthouse two or three times and drove away. They returned, parked their cars, and marched single file down west of the courthouse. As they neared the courthouse a shot was fired, following which there were a great many shots fired and one white man was killed. Following the shooting the negroes left the vicinity of the courthouse and apparently went back to the negro section of the city. A large number of white men then broke into a hardware store, a pawnshop, and another place, where arms were kept, and armed themselves with guns, revolvers, and ammunition, and in a short while after the firing occurred at the courthouse the streets were full of armed white people. Two or three hundred armed men assembled around the police station and were sent out to different parts of the town ostensibly to guard the town. From that time until about 9 or 10 o'clock the following day there was a great deal of shooting, especially in the negro section of the city, and a number of men were killed. Beginning about 2 o'clock in the morning of June 1st, fires began to break out in the negro section of the city. The fire department, in attempting to respond to calls coming in from the negro section, found the streets full of armed white men, who, with pointed guns, refused to permit the firemen to connect the hose, and forced them to return to the fire stations without rendering any service in extinguishing the fires. After a few attempts to reach the fire the chief of the fire department directed the men to respond to no more calls until morning. About daylight on the morning of June 1st, at the sound of a whistle, shooting became rather general and continued for some time. Armed white men, described as traveling in groups of from a dozen to 20, rounded up the negroes found in the section where the fires were burning, and took or sent them to the convention hall where they appear

to have been detained. A number of witnesses testified that these groups of white men, many of them wearing police badges and badges indicating that they were deputy sheriffs, after removing the negroes from buildings, went inside the buildings and, after they left, fires broke out inside the buildings. By nine o'clock buildings were burning in every part of the negro section of the city. One witness, whose testimony is not questioned, testified that about 9 o'clock he viewed the scene from the top of the Tulsa hotel. He testified that it looked like the whole section of the negro district was on fire. His estimate was that he saw 30 or 40 different fires in different places in the negro section. He testified that he knew the section well and definitely located the fires; that what part of it was not burning at the time had been burned and the houses had been consumed. By twelve o'clock, noon, all the buildings in the negro section had been burned. About 7:30 in the morning one of the fire wagons responded to a call to protect a wholesale house and lumber yard. One of the firemen testified that the fires appeared to him to be all over the negro section; that they were not molested that time in their attempt to put out the fire; that there was a great deal of shooting going on and that "there was an awful bunch of men going along there all morning"; that there was a great deal of shooting going on; that he saw white men shooting and there was shooting from the north; that the fires appeared to be starting from the inside of the buildings, except the lumber yard appeared to start from the outside. It caught from the adjoining building just across the fence; that while protecting the lumber yard fire broke out in a negro hospital near the lumber yard; that after the fire was extinguished in the hospital it broke out again, was extinguished and broke out the third time. He was unable to say how the fire was started.

The evidence shows conclusively that there was rioting in the city of Tulsa from about 10 o'clock p. m., May 31, 1921, until about noon of the following day; and during that time all the buildings in the negro section of the city of Tulsa, where the buildings involved in this suit were located, were entirely destroyed by fire.

There was evidence to show that the plaintiff's hotel and theater buildings were burned between 9:30 or 10 o'clock and noon of the morning of June 1st; that before these buildings were burned a train of cars

south and west of the hotel was burning and at that time there were other buildings standing between the hotel and the burning cars and the wind was blowing in an easterly direction toward the plaintiff's building. Plaintiff, in his brief, says:

"The plaintiff in rebuttal established that the property of the plaintiff took fire anywhere from 10:30 to about 12 o'clock. That there was some buildings between the Red Wing Hotel and the railroad track; that the railroad track was south and west of the Red Wing Hotel, and that there was a train of cars on fire at that place, and that the wind was in an easterly direction. No witness in the entire case testified that they know how the plaintiff's buildings caught fire; the inference that they caught fire by reason of the disturbance being purely of a circumstantial character, and under these facts it is contended by the plaintiff that the court erred in directing a verdict and taking upon himself the authority of deciding the case for three reasons:

"First, we contend it was purely a question of fact for the jury to determine under proper instructions from the court whether the property of the plaintiff was destroyed directly or indirectly from a cause excepted in the policy, such as riot, invasion, etc.

"Second, it was the duty of the court to submit the issue under proper instructions as to whether the property was destroyed by fire by persons engaged in the disturbance, whether one would call it a riot or merely a disturbance, or whether the fire was caused by officers of the law in seeking to suppress the disturbance.

"Third, we contend that it was the duty of the court to submit to the jury, under proper instructions, the issue as to whether or not the fire may not have been caused by other causes that were wholly disconnected with the disturbance."

The established rule of this court is as stated in the cause of Kinney v. Grooms, 63 Okla. 164, 163 Pac. 531:

"It is only when the evidence, with all the inferences the jury could reasonably draw therefrom, will be insufficient to support a verdict for plaintiff, that the court is authorized to direct a verdict for defendant, and unless the evidence is such that no recovery can be had upon any view that can be properly taken of the facts, as presented by the evidence, the case should be left to the jury under proper instructions."

The plaintiff contends that under the rule adopted by the Supreme Court of Kentucky in the case of American Central Ins. Co. v. Stearns Lumber Co., 145 Ky. 255, 36 L. R. A. (N. S.) 566, there was sufficient evidence reasonably tending to support the theory

that there was an intervening cause of the fire sufficient to go to the jury.

In that case a deputy United States marshal, armed with process from the federal court, was attempting to arrest three men who had taken refuge in a hotel building and resisted arrest. They killed one deputy marshal who attempted to enter the building. The marshal, in order to make the arrest without suffering the loss of life, set fire to and burned the hotel building. The court disposed of that case in this language:

"The deputy marshal in the case before us had no more authority to set the house on fire than the sheriff in the case cited. The loss of the house was not due, directly or indirectly, to the order of any civil authority; for the marshal had no authority to burn the house. He was not a civil authority for this purpose. The rioters were in the house; the marshal's posse, acting under his orders, were not rioters. The loss of the house was not due, directly or indirectly, to the riot carried on by the men within the house. It was due directly to the wrongful act of the marshal in setting fire to the house without authority. The riot within the house was the occasion of his wrongful act, but the loss of the house was not the proximate result of their unlawful acts. The loss of the house was the direct result of another unlawful act, which intervened between their act and the burning of the house. The unlawful act of the marshal in setting fire to the house was the cause of the loss. It necessarily follows that the insurance company was not released from liability by the clause of the policy above quoted."

The rule there adopted has no application to the facts of this case. While the evidence shows that a great number of men engaged in arresting the negroes found in the negro section wore police badges, or badges indicating they were deputy sheriffs, and in some instances were dressed in soldier's clothes and represented to the negroes that they were soldiers, there is no evidence that any negro ever resisted arrest, or that any fire was started in order to make such arrest. The only evidence contained in the record tending to show that any person wearing a police or deputy sheriff's badge, or in any way pretending to act in an official capacity, set fire to any building, was after the arrest had been made or where no arrest was being made or attempted. There was no evidence that the men wearing police badges or sheriff's badges were in fact such officers or acting in an official capacity.

In Pacific Union Club v. Commercial Union

Assurance Co. (Cal.) 107 Pac. 728, cited by plaintiff, the policy provided that the company should not be liable for loss caused directly or indirectly by earthquake, and the fire occurred in San Francisco the day following the earthquake. The company defended upon the ground that the earthquake broke the water pipes in the city so that the fire department was unable to fight the fire, and contended that the earthquake was the indirect cause of the loss. It was held that the earthquake was not in legal contemplation the cause of the fire because none of the parties contemplated that the earthquake might cut off the water supply. We think this case is not applicable for the reason that the evidence here does not show any intervening cause.

In Pacific Heating & Ventilating Co. v. Williamsburgh City Fire Ins. Co. (Cal.) 111 Pac. 4, cited by plaintiff, the court held:

"A policy insuring against loss by fire, providing that insurer shall not be liable for loss caused 'directly or indirectly' by either of certain causes, and then, after a semicolon, 'or for loss * * * occasioned by or through * * * earthquake,' excepts from the policy, as regards loss through earthquake, only such as is caused 'directly' as well as proximately thereby; and 'so not a loss from fire set by earthquake to a distant building, and communicated to the insured building through the burning of intermediate buildings."

It is apparent that the case is not in point. Because of the peculiar phraseology of the exception, it was necessary to the exception that the earthquake should be the direct cause of the fire.

Plaintiff cites a number of authorities which sustain his contention that provisos and exceptions contained in insurance policies must be strictly construed against the insurer and liberally in favor of the insured, and that where the defense is made based on an exception, or proviso, contained in the policy, the burden is upon the insurer to prove that the facts bring the case within the exception. In the instant case, the defendant assumed, and, we think, sustained the burden of proof, and then the burden rested upon the plaintiff to prove the intervening cause. There was no evidence offered by plaintiff reasonably tending to show any cause for loss other than that shown by the defendant's evidence that the loss was caused directly or indirectly by the riot. Plaintiff does not contend that he is entitled to recover if the loss was caused directly or indirectly by the riot, and therefore a construction of the language of the policy is not called for.

We think, after a careful consideration of the entire record, that there was no evidence reasonably tending to sustain plaintiff's theory of the case, and the court did not err in directing a verdict for the defendant.

The judgment is affirmed.

By the Court: It is so ordered.

Note.—See 26 C. J. p. 519 §729; p. 551 §766; 20 L. R. A. (N. S.) 277; 14 R. C. L. p. 1221.