John Melvin ALEXANDER; Juanita Delores Burnett Arnold; J.B. Bates; Essie Lee Johnson Beck; James D. Bell; Phines Bell; Frances Blackwell; Juanita Williams Blakely; Juanita Smith Booker; Kinney Booker; Dorothy Booker Boulding; Jeanette McNeal Bradshaw; Teresa Earlee Bridges Dysart; Johnnie L. Grayson Brown; Lee Ella Strozier Brown; Clarence Bruner; Lula Belle Lacy Bullock; Joe R. Burns; Rose L. Green Bynum; Muriel Mignon Lilly Cabell; Beatrice Campbell–Webster; James Dale Carter; Rosella Carter; Samuel Cassius; Naomi Hooker Chamberlain; Mildred Mitchell Christopher; Mildred Lucas Clark; Otis Granville Clark; Sandy Clark; Blanche Chatman Cole; Wordie "Peaches" Miller Cooper; Carrie Humphrey Cudjoe; Laverne Cooksey Davis; Dolly Mae Daufitt; James Durant; Lucille B. Buchanan Figures; Archie Jackson Franklin; Jimmie Lilly Franklin; Joan Hill Gambrel; Earnestine Gibbs; Harold Gibbs; Theressa Cornella McNeal Gilliam; Edward L. Givens; Bertha Guyton; Hazel Franklin Hackett; Mildred Johnson Hall; Nell Hamilton Hampton; Leroy Leon Hatcher; Madeleine Haynes; Joyce Walker Hill; Robert Holloway; Dr. Olivia J. Hooker; Samuel L. Hooker, Jr.; Wilhelmina Guess Howell; Charles Hughes; Myrtle Wells Hurd; Vera Ingram; Eunice Cloman Jackson; Genevieve Elizabeth Tillman Jackson; Willie Bell White Jackson; Dr. Hobart Jarrett; Artie Lacy Johnson; Wilma Mitchell Johnson; Edward Earven Jones; Hazel Dolores Smith Jones; Julia Bonton Jones; Percy Jones; Thelma Thurman Knight; Leanna Johnson Lewis; Katie Mae Johnson Livingston; Alice

Higgs Lollis; Roanna Henry McClure; Eldoris Mae Ector McCondichie; Carol Smitherman Martin; Mary Tacoma Maupin; Willie Musgrove Means; Ishmael S. Moran; Ruth Dean Nash; Simeon L. Neal; Almadge J. Newkirk; Myrtle Napier Oliver; Juanita Maxine Scott Parry; Ida Burns Patterson; Freddie Scott Payne; June Alexander Powdrill; Alice Presley; Delois Vaden Ramsey; Cora Hawkins Renfro; Simon R. Richardson; Jewel Smitherman Rogers; Gerline Helen Wright Sayles; Julius Warren Scott; William A. Scott; Tuleta S. Duncan Shawnee; Veneice Dunn Simms; Hal "Cornbred" Singer; Naomi Siplin; Beulah Loree Keenan Smith; Golden Williams Smith; Lola Sneed Snowden; James L. Steward; Dorothy Wilson Strickland; Sarah Tatum; Lois White Taylor; Willie Mae Shelburn Thompson; Effie Lee Spears Todd; Melvin C. Todd; Kathryn Mae Taylor Tolin; Bessie Mae Austin Vester; Queen Esther Love Walker; Samuel Walker; Troy Sidney Walker; Oscar Douglas Washington; Mary Leon Brown Watson; Allen Matthew White; Cecil White; Marie Whitehorn; Mildred Evitt Wilburn; Bertram C. Williams; Louie Barton Williams; William Harold Woods; Clotie Lewis Wright; Wess Young; Donna Adams; Johnetta Adams; Thomas Adams, Jr.; C.J. Alexander; George Alexander; Lillian Alexander; Brenda Nails Alford; Betty Anderson; Rhonda Anderson; Robert Earl Anderson; Irma Thomas Anthony; Leona Jerrye Bruner Anthony; Mary Bell Arrington; Arven Autry; Elmer Autry; James Autry; Otis Autry, Jr.; Ruth Ella Autry; Marguerite Bagby; John Bailey; Nicholas A. Banks; Edith McAlester Barnes; Leslie Beard; Raymond Beard, Sr.; Audele

McCleod Beeks; R.G. Bell; Wilma Presley Bell; Simon Berry Jr.; Rev. Bradford Bishop; Eugene Bolton; James Bolton; Oscar Boyd; Dorothy Williams Branlett; Dorothy Jackson Brewer; Patricia Dukes Brome; Naomi Lawson Brown; William Bruner; Brenda Fair Campbell; Henry Cannon; Nathaniel Cannon; Edwina Walker Carr; Bernard Carter; Eddie Hue Carter; Robert Carter, Jr.; Samuel Lee Carter; Elizabeth Cooley Chappelle; Anita Williams Christopher; Vassie Clark; Aileen Joanne Austin Coburn; Marilyn Kay Johnson Coley; Erline Crosslin; Bernice E. Banks Davis; Fred Davis; Roy Davis; Lawrence Herman Dennie; Evelyn Diggs; Robert Charles Dukes; Willie Dukes; Rita Duncan; Roger Duncan; Sylvia A. Dunn; Amy Gamble Eidson; Mary L. Emerson; Bill Ewing; Jo Ann Ewing; Robert Ewing; Janet Fair; Stanley Fair, Jr.; Wilbur Foster; Alfreda O. Dennie Franklin; John Hope Franklin; Jean Freeny; Thelma Kinlaw Germany; Margaret Jean Tilley Gibbs; Bobbye Louise Gilbert; Jeanne Osby Goodwin; Linda Edmondson Graves; Albert Grayson; Katherine Wood Hale; Leontyne Thomas Harrell; Delores Harrington; Mary Priscilla Parker Harrison; Jeanette Hawkins; Olander Hawkins; Starla Hawkins; Jobie Elizabeth Holderness; Maybelline Presley Hooks; Juanita Alexander Hopkins; Sharon Hopkins; Emma Lockard Horn; Maximillian Howell; Midlred Wallace Huspeth; Helen Sipuel Huggins; Clarence Jackson; Della Shelton Jackson; Gail Jackson; Genieive Jackson; Rosie Lee Jackson; Sayyid Jami; Arthur Jefferson; Lula Mae Jefferson; Matthew Jefferson; Robert Jefferson; Geraldine Fair Jessie; Carolyn Price Johnson; Felicia McLeod

1208

Johnson; Joann Johnson; Ronald Wayne Johnson; Val Gene Johnson, Sr.; Dorothy Jones; Eva Mae Tilley Jones; Melvin "Tip" Jones; Mildren Presley Kavanaugh; Vernell Kelley; Beverly Nails Kelly; Lorell Kirk; Francine Johnson Knapper; James Bernard Knighten; Maxine Jackson Lacy; Sandra Jean Davis Landrum; Caesar Latimer; Charles Sylvester Latimer; Hazel Latimer; James Harold Latimer; Jayphee Latimer; Lisa Latimer; Patrice Latimer; Burnece Lawler; Edward Lawson; Johnnye Cannon Lawson; Marcus Lawson; Margaret Ann Lawson; Palmer Lawson, Jr.; Glenda Lebeaux; Margaret Lee; Norma Jean Dennie Leshie; Jimmie Lewis; Joe Lewis; Lorraine Lewis; Cortez Lockard; Edward Lockard; Ernest Lockard; Frank Lockard; Jessie Mae Lockard; Oscar Lockard; Selma Lockard; Mary Loupe; Catherine Martin; Felton Martin; James Preston Martin; Nancy Martin; Faye May; Sarah Curvay Mayshaw; Leona Austin McCain; Pauline McCants; Denise McCray; Otis McCray, III; Lorraine McFarland; Jean Williams McGill; Donald John McGowan; Wallace McLeod, Jr.; Betty Presley McMillan; Ladawna Miller; Mildred Marian Hamel Miller; Peggy Ann McRuffin Mitchell; Oveta Mixon; Elizabeth Presley Monday; Pat Galbraith Moore; Ronald Earl Moore; Eva Gamble Morris; Clarinda Nails; Terry Nash; Eartha McAlester Norman; Mattie Davis Oliver; Lavada Louise Parker Osbourne; Audrey Banks Parson; John W. Patton; Lena Mae Johnson Payne; Julius Pegues; Geraldine Perryman–Tease; Wanda Ewing Pope; Esco Porterfield; Mark Porterfield; Jill Elizabeth Presley; Joyce Marie Presley; Lisa Presley; Raymond Presley; Ronald Dean Presley; Floyd Price; Jane Fair Pruett; Marcia Walker Puckett; Joyce Ramsey; Allene Knighten Rayford; Mae Etta Reynolds; Shirley Ridley; Patsy Robinson; Frank Eugene Rodgers; Eric Rollerson; Leon Rollerson; Wila Rollerson; Yvonne Rollerson; Janice Lou Johnson Ross; Billie Wayne Rucker; J.C. Rucker; Robert C. Rucker; Bobbie Jean Saulet; Mildred Louise Davis Scott; Theresa Davis . Scott; Yvonne Fair Shaw; Billy Shelton; Diana Lynn Shelton; Johnny Shelton; Maime Shelton; Shirley Shelton; Euna Vann Smith; Fred Smith; Harriet Adams Smith; Ora Smith; Claudia Maude Smitherman; Cathryn Bell Snoddy; Betty Spears; Diane Anderson Steele; Patricia McLeod Stephenson; Laurel Stradford; Rosa Striplin; Carrie M. McDonald Strother; Martha McGlorie Swindall; Audrey Taylor; Byron Taylor; Bobbie Jean Carter Tennyson; Sylvester Terry, Jr.; Margaret Tharpe; Jerry Fields Thomas; Jessie Thomas; Erma Smith Thompson; Pansy Tilley; Clifton Joe Tipton; Rosezella Turner; Shirley A. Johnson Tyus; Maxine Jessie Vaden; Lorenzo Carlos Vann; Alice Boyd Vaughn; Fannie Smith Verner; Pamela Vinson; Marietta Anderson Waiters; Denette Maria Walker; Frank Walker, Sr.; Harry Daniel Walker; Harvey Leon Walker; Riley Walker, Jr.; William D. Walker; Marge Wallace; Maybelle Wallace; Mildred Cannon Wallace; Sylvia Ware; Olene Walker Washington; Jimmie Wickam; Yvonne Wiley–Webb; Charlotte Williams; David Williams; Fannie Williams; Grant Williams; Patricia Williams; Ida Louise Dennie Willis; Annie Alexander Wilson; Bertha Wilson; Bobbie Wilson; Elizabeth Wilson; Mary A.

Wilson; Naomi Nash Williams Wimberly; Ramona Dinkins Wimberly; Edna Early Works; Charlotte Wright, Plaintiffs–Appellants,

v.

The State of OKLAHOMA; The City of Tulsa; The Chief of Police of the City of Tulsa, in his official capacity; The City of Tulsa Police Department; Does 1 thru 100, inclusive, Defendants–Appellees.

No. 04–5042.

United States Court of Appeals, Tenth Circuit.

Sept. 8, 2004.

Michael D. Hausfeld, Cohen Milstein Hausfeld & Toll, P.L.L.C., Washington, DC (Agnieszka M. Fryszman, Cohen Milstein Hausfeld & Toll, P.L.L.C., Washington, DC; Charles J. Ogletree, Jr., Harvard Law School, Cambridge, MA; Suzette Malveaux, University of Alabama School of Law, Tuscaloosa, AL; Michele A. Roberts, Shea & Gardner, Washington, DC; Eric J. Miller, Western New England College School of Law, Springfield, MA; Adjoa A. Aiyetoro, National Coalition of Blacks for Reparations In America (N'COBRA), Washington, DC; Leslie Mansfield, University of Tulsa, Boeshe Legal Clinic, Tulsa, OK; James O. Goodwin, Goodwin & Goodwin, Tulsa, OK; Johnnie L. Cochran, Jr., Law Offices of Johnnie L. Cochran, Jr., New York, NY; Dennis C. Sweet III, Sweet & Freese, P.L.L.C., Jackson, MS; Sharon Cole Jones, Tulsa, OK; Rose Sanders, Selma, AL; Willie E. Gary, Lorenzo Williams, and Tricia Purks Hoffler, Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, Stuart, FL, with him on the briefs), appearing for Plaintiffs–Appellants.

Larry V. Simmons, Deputy City Attorney (Martha Rupp Carter, City Attorney, and Robert R. Edmiston, Assistant City Attorney, with him on the brief), City of Tulsa, OK, appearing for Defendants–Appellees Tulsa Police Department, the City of Tulsa, and the Chief of Police of the City of Tulsa.

Wellon B. Poe, Assistant Attorney General, Oklahoma City, OK, appearing for Defendant–Appellee State of Oklahoma.

Before TACHA, Chief Circuit Judge, BARRETT, Senior Circuit Judge, and TYMKOVICH, Circuit Judge.

TACHA, Chief Circuit Judge.

On May 31, 1921, and following into the next day, violent attacks destroyed the African–American community of Greenwood, Oklahoma. An angry white mob converged on Greenwood in a devastating assault, burning homes and businesses, killing up to three hundred people, and leaving thousands homeless. In February 2003, Plaintiffs–Appellants, all Riot survivors or descendants of survivors, filed suit against the City of Tulsa, the Tulsa Police Chief, the City of Tulsa Police Department, and the State of Oklahoma. In their complaint, Plaintiffs sought monetary damages and injunctive and declaratory relief. The District Court held the claims time barred. Because we hold that Plaintiffs' claims cannot withstand scrutiny under either an accrual analysis or pursuant to equitable tolling principles, we AFFIRM.

## I. BACKGROUND

On the evening of May 31, 1921, a crowd began to form in front of the Tulsa jail after rumors of a lynching spread through the city. The rumors followed publication of a newspaper story suggesting that a nineteen-year-old African–American named Dick Rowland had assaulted a white elevator operator. After a group of African–Americans went to the courthouse to defend Mr. Rowland, a struggle ensued; and a gun went off. The Greenwood Riot had begun.

In the midst of repeated gun battles, the African–Americans retreated to the Greenwood neighborhood followed by the white

mob, which included between 250–500 newly deputized men. Armed with machine guns, the white mob ravaged Greenwood, scattering machine gun fire indiscriminately at its African–American residents. During the night, the Governor called in the Oklahoma National Guard to restore order. The guardsmen, often acting in conjunction with the white mob, disarmed the African–American men who were defending their community and placed them in "protective custody." Thus purged of any resistance, the white mob burned virtually every building in Greenwood. By 11:00 a.m. on the morning of June 1, 1921, when the Riot ended, forty-two square blocks of the Greenwood community lay in ashes.

In 1997, the Oklahoma state legislature commissioned a study of the Riot. Following four years of intensive study, the bipartisan commission, which consisted of eleven members from various sectors of the community, issued its final report ("the Report"). In it, the commissioners confirmed that public officials had indeed provided firearms and ammunition to the white mob. The Report opined that the National Guard participated in mass arrests of all, or nearly all, of Greenwood's residents. The Report also provided detail concerning the deliberate burning of homes and businesses, burning initiated, in many instances, by agents of the government. In adopting many of the Report's findings, the state legislature found:

> Official reports and accounts of the time that viewed the Tulsa Race Riot as a "Negro uprising" were incorrect. Given the history of racial violence against African–Americans in Oklahoma, including numerous lynchings by white mobs, and the breakdown of the rule of law in

Tulsa on May 31–June 1, 1921, it is understandable that African–Americans believe[d] they needed to assist Tulsa police in protecting Dick Rowland, an African–American accused of attempting to rape a white woman, against an assembled white mob. The documentation assembled by The 1921 Tulsa Race Riot Commission provides strong evidence that some local municipal and county officials failed to take actions to calm or contain the situation once violence erupted and, in some cases, became participants in the subsequent violence which took place on May 31 and June 1, 1921, and even deputized and armed many whites who were part of a mob that killed, looted, and burned down the Greenwood area[.] Okla. Stat. tit. 74 § 8000.1.2 (West 2002).

Plaintiffs filed their initial complaint on February 24, 2003. In it, they alleged civil rights claims under 28 U.S.C. §§ 1981, 1983, and 1985. They also brought claims under the Fourteenth Amendment to the Federal Constitution and the Equal Protection Clause. Finally, they submitted state law claims based on negligence and promissory estoppel. Admitting that a two-year statute of limitations applies to the action,[1] Plaintiffs nevertheless argue that the complaint was timely because the "conspiracy of silence" surrounding the Riot and its aftermath delayed the accrual of their claims until issuance of the Report in February 2001. In the alternative, they maintain that various equitable tolling principles apply which extend the limitations period.

Instead of answering the complaint, the State and the City filed motions to dismiss. The District Court allowed the parties to exchange interrogatories and requests for

---

**1.** The parties agree that the applicable limitations period for the claims is two years. *See* Okla. Stat. tit 12, § 95 (West 2000); *see also* *Fratus v. Deland,* 49 F.3d 673, 675 (10th Cir. 1995) (applying state statute of limitation to civil rights actions under § 1983).

admission pertaining to the statute of limitations issue. In addition, the District Court took testimony from three witnesses, all Plaintiffs' experts, on issues related to the limitations questions. The court also allowed supplemental briefing on whether the publication of a 1982 book by Dr. Scott Ellsworth, entitled *Death in a Promised Land,* placed Plaintiffs on notice of their claims.

Analyzing the motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court held:

> Regardless of the legal theory relied on, equitable estoppel, equitable tolling, or accrual, the gravamen of Plaintiffs' argument is that they did not and could not know of the City's involvement any sooner. While it is certain that the Commission Report has helped to gather more facts about the Riot, the Court has considerable trouble with the Plaintiffs' assertion that until the Commission issued its report, they were unaware of the City's responsibility for their injury. Dist. Ct. Order at 18.

The court then granted the Defendants' motions to dismiss. In particular, the court opined that, although extraordinary circumstances sufficient to toll the statute of limitations existed in the period following the Riot, those circumstances dissipated in the 1960s, thus enabling Plaintiffs to bring their claims. *Id.* at 21–23.

On appeal, Plaintiffs argue that the court erred in its application of the motion to dismiss standard by making factual findings, contrary to the dictates of Rule 12(b)(6), regarding when Plaintiffs could access courts to redress the wrongs inflicted by the Riot. They contend that the court committed reversible error in attributing to Plaintiffs knowledge of facts that allegedly came to light only after the Report issued. Finally, they maintain that the court relied improperly on the exis-tence of lawsuits immediately following the Riot to impute knowledge to Plaintiffs. We address these arguments in turn.

## II. STANDARD OF REVIEW

### A. Conversion of the Motions To Dismiss

■■■■ In its order, the District Court analyzed Plaintiffs' claims under the dismissal standards of Federal Rule of Civil Procedure 12(b)(6). On appeal, we review a Rule 12(b)(6) dismissal *de novo. Indus. Constructors Corp. v. United States Bureau of Reclamation,* 15 F.3d 963, 967 (10th Cir.1994). The City argues, however, that, because the court considered materials outside the complaint in making its rulings, we must apply a summary judgment standard of review. Federal Rule of Civil Procedure 12(c) states:

> If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. Fed.R.Civ.P. 12(c).

Specifically, the City maintains that a de facto conversion occurred because (1) both parties presented material to the court which went beyond the four corners of the complaint and (2) the court referenced at least some of those materials in its order. Plaintiffs, on the other hand, argue that although the parties provided additional materials, the court did not rely on them. They maintain that this lack of judicial reliance, and the fact that the parties mentioned outside materials only in passing, prevents us from altering the court's analysis under Rule 12(b)(6).

After carefully reviewing the record and the District Court order, we agree with the City.

> Where a party has moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted and matters outside of the pleadings have been presented to the court for consideration, the court must either exclude the material or treat the motion as one for summary judgment.... *Nichols v. United States,* 796 F.2d 361, 364 (10th Cir.1986).

It is undisputed that the District Court: (1) received materials outside the complaint from both parties, and (2) did not expressly exclude the material. Thus, to convert the District Court's Rule 12(b)(6) order to one for summary judgment, we must find that the District Court relied on this material in rendering its decision. *See United States ex rel. Holmes v. Consumer Ins. Group,* 318 F.3d 1199, 1203 (10th Cir. 2003) (reviewing a district court's Rule 12(b)(6) order as one for summary judgment where "the district court relied on affidavits and other evidence submitted by the parties").

Contrary to Plaintiffs' suggestion, the record makes clear that the District Court relied substantially on the extraneous evidence in rendering its decision.[2] Specifically, the court referenced in its order the hearing held on the motions to dismiss and the testimony presented by Plaintiffs' experts. Dist. Ct. Order at 4, 22–23. Likewise, the court noted its approval of the supplemental briefs filed on the issue whether the book *Death In A Promised Land* provided Plaintiffs with notice of their claims, stating that it found these extra materials "helpful." *Id.* at 12. The court also relied specifically on the testimony of one of the experts in making its ruling on the issue of extraordinary circumstances tolling. *Id.* at 22–23. Nowhere in the order does the court reject or otherwise exclude any of the evidence offered as a result of discovery.[3]

While "[t]he court cannot convert a motion to dismiss to a motion for summary judgment without notice, unless the opposing party has responded ... by filing his own affidavits[,]" *Ketchum v. Cruz,* 961 F.2d 916, 919 (10th Cir.1992), we find such a conversion permissible here because Plaintiffs were both on notice of the possibility of conversion and provided their own affidavit to the District Court, *see Arnold v. Air Midwest, Inc.,* 100 F.3d 857, 859 n. 2 (10th Cir.1996) ("Because [the non-movant] submitted material beyond the pleadings in opposition to defendants' motion, he is scarcely in a position to claim unfair surprise or inequity."). The City filed its motion to dismiss in the alternative as one under Rule 56(c), and Plaintiffs addressed the summary judgment standard in their response to that motion. Plaintiffs also attached an informal affidavit from Dr. Ellsworth to the supplemental brief referenced in the District Court's order. Ac-

---

2. The District Court also cited extensively from the Report in its order. Because the Report was attached to the complaint, however, it was not "outside the pleadings" for purposes of analyzing this issue. *See GFF Corp. v. Assc. Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384–85 (10th Cir.1997) (finding consideration of a letter appropriate under a 12(b)(6) standard where it was quoted in the complaint and central to the issues presented).

3. In this regard, Plaintiffs' reliance on *Owens v. Rush,* 654 F.2d 1370 (10th Cir.1981), is misplaced. There, we refused to convert a 12(b)(6) ruling into one for summary judgment "because the order [dismissing the claims] refers to no facts shown or admissions made in the papers on file...." *Id.* at 1377 n. 9. Here, by contrast, the District Court's order makes clear the court considered evidence and briefing outside the pleadings.

cordingly, we must review Plaintiffs' accrual claim under a summary judgment standard.

■■■ In evaluating a summary judgment order, our review is *de novo;* and we apply the same standard as a district court would. *City of Wichita v. United States Gypsum Co.,* 72 F.3d 1491, 1497 (10th Cir.1996). Specifically, "[s]ummary judgment is appropriate where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." *Biester v. Midwest Health Servs., Inc.,* 77 F.3d 1264, 1265 (10th Cir.1996) (internal quotations and citations omitted); *see also Wolf v. Preferred Risk Life Ins. Co.,* 728 F.2d 1304, 1306–07 (10th Cir.1984) ("[I]f the statute of limitations depends on disputed [material] facts, then summary judgment is inappropriate.").

### B.  Equitable Tolling Claims

■■■ This conclusion does not, however, end our analysis with respect to the standard of review. We must also consider the standard on the equitable tolling claims. The District Court refused to invoke equitable principles to toll the statute of limitations. "We review the district court's refusal to apply equitable tolling for an abuse of discretion." *Garrett v. L.E. Fleming,* 362 F.3d 692, 695 (10th Cir.2004). Contrary to Plaintiffs' argument, nothing in the District Court's order suggests that it failed to use discretion in considering equitable tolling principles. Thus, we will review Plaintiffs' accrual argument under summary judgment standards and the District Court's refusal to invoke equitable tolling principles for an abuse of discretion.

### III.  DISCUSSION

#### A.  Accrual Claim

■■■ Plaintiffs filed the underlying complaint on February 24, 2003. Thus, under Oklahoma's applicable two-year statute of limitations provision, the claims are untimely unless they accrued on or after February 24, 2001. Plaintiffs maintain the claims did not accrue until publication of the Report on February 28, 2001. If that is the case, the claims are timely independent of any equitable tolling.

■■■ As a preliminary matter, we note that federal law controls issues related to when federal causes of action accrue. *Baker v. Board of Regents of the State of Kansas,* 991 F.2d 628, 632 (10th Cir.1993). In general, under the federal discovery rule, claims accrue and "[t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." *Indus. Constructors Corp. v. United States Bureau of Reclamation,* 15 F.3d 963, 969 (10th Cir.1994). In particular, " '[a] civil rights action accrues when facts that would support a cause of action are or should be apparent.' " *Fratus v. Deland,* 49 F.3d 673, 675 (10th Cir.1995) (internal quotations omitted).

It is obvious, and Plaintiffs do not dispute, that they had knowledge of their physical and property-related injuries at the time of the Riot. Indeed, they had the painful experience of watching neighbors die and seeing their homes and businesses burn. Widespread publicity surrounded this devastation. News articles attached to the Report illustrate that the Riot's impact was not only known locally, but that it became a national news event as well.

■■■ Despite these obvious signs of injury, Plaintiffs argue that the causes of action lay dormant until issuance of the Report because, until that time, they did

not know the level of culpability or responsibility of the City and State. We have found, however, that a plaintiff need not have conclusive evidence of the cause of an injury in order to trigger the statute of limitations. *See Baker,* 991 F.2d at 632 ("[I]t is not necessary that a claimant know all of the evidence ultimately relied on for the cause of action to accrue."). Rather, we focus on whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm. *See id.* In this context, a plaintiff must use reasonable diligence in seeking to discover facts giving rise to a claim for relief. *See Industrial Constr.,* 15 F.3d at 969.

Despite the difficult facts presented here, we resist the temptation to alter circuit precedent in the manner Plaintiffs suggest. Taken to its logical end, their argument would require us to craft a rule delaying accrual of a cause of action until a plaintiff has detailed knowledge of the level of culpability of each of the actors involved. This we cannot do.[4] Plaintiffs' injuries and the general cause of those injuries were obvious in the aftermath of the Riot. To start the running of the statute of limitations, our case law requires nothing more. We hold, therefore, that the Defendants were entitled to summary judgment on the issue whether Plaintiffs' claims accrued prior to publication of the Report.

### B. Equitable Tolling

Plaintiffs advocate tolling of the limitations period under several legal theories. First, they maintain that Defendants concealed the nature of their bad acts by manipulating the post-Riot grand jury, which exonerated the white mob and blamed victims for the Riot. That concealment, they argue, prevented Plaintiffs from gathering the facts necessary to pursue their claims. Second, Plaintiffs assert they relied to their detriment on the City's promises to rebuild Greenwood, which made them sit on their rights in hopes that the City and State would compensate them. Third, Plaintiffs claim extraordinary circumstances, including a racially hostile environment and an inability to seek meaningful redress in Oklahoma courts, existed sufficient to toll the statute.

■■ The District Court rejected the first two equitable theories, but held that sufficient extraordinary circumstances existed to justify tolling. The court also found, however, that those circumstances dissipated substantially by the 1960s. As a result, it determined that Plaintiffs could have brought this action at some unspecified point prior to 2001. We must affirm the District Court on this issue unless we have " 'a definite and firm conviction that [it] has made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.' " *Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1164 (10th Cir. 1998) (quoting *McEwen v. City of Nor-*

---

4. Plaintiffs rely heavily on *Maughan v. SW Servicing, Inc.,* 758 F.2d 1381 (10th Cir.1985), to support their argument that a plaintiff must know the level of a defendant's culpability before a cause of action accrues. In *Maughan,* under Utah's version of the discovery rule, we approved a rule allowing tolling in a wrongful death suit involving exposure to carcinogens "until the plaintiff knows or should know of facts supporting the likelihood that one particular suspected carcinogen was the cause of his cancer, and has identified the likely source of his exposure to that carcinogen." *Id.* at 1387. We adopted this liberal application of the discovery rule only "in cases involving suspected carcinogens" because of their invisible nature, their impossibility to ascertain at the time of exposure, and "the complexities of cancer causation." *Id.* In contrast, Plaintiffs faced violence here which was notable in part for its very public and obvious nature.

*man,* 926 F.2d 1539, 1553–54 (10th Cir. 1991)).

■ "Congress did not establish a statute of limitations or a body of tolling rules applicable to actions brought in federal court under § 1983—a void which is commonplace in federal statutory law." *Board of Regents v. Tomanio,* 446 U.S. 478, 484, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). As such, state law governs the application of tolling in a civil rights action.[5] *See id.* at 484–87, 100 S.Ct. 1790; *Garrett,* 362 F.3d at 697.

In general, Oklahoma permits the tolling of a statute of limitations in two circumstances. First, the existence of a "legal disability" provides proper grounds for equitable tolling. *See* Okla. Stat. tit. 12, § 96 (West 2000). Although the exact definition of this term remains unclear, Oklahoma courts have applied this provision only for plaintiffs whose competency is impaired or who have not reached the age of majority. *See, e.g., Lovelace v. Keohane,* 831 P.2d 624, 629 (Okla.1992) (finding that those who could conduct their own business affairs over time are sufficiently competent to render them ineligible for "legal disability" tolling); Okla. Stat. tit. 12, § 96 (citing incompetence and failure to attain the age of majority as grounds for meriting legal disability tolling). As Plaintiffs offer no evidence of such incompetency, they fail to meet this standard.

■ Second, the Oklahoma discovery rule tolls the statute of limitations "until an injured party knows of, or *in the exercise of reasonable diligence,* should have known of or discovered the injury, and resulting cause of action." *Id.* Therefore, if defendants engage in "false, fraudulent or misleading conduct" calculated to lull plaintiffs into sitting on their rights, the limitations period may not be triggered. *Jarvis v. City of Stillwater,* 732 P.2d 470, 473 (Okla.1987); *see also Hurt v. Garrison,* 192 Okla. 66, 133 P.2d 547, 550 (1942) (holding a statute of limitations tolled during a period of fraudulent concealment). With these standards in mind, we turn to Plaintiffs' claims.

### 1. Concealment

■ As the District Court noted, a defendant who conceals facts relevant to a cause of action against him is estopped from raising the statute of limitations bar. *Morris v. Wise,* 293 P.2d 547, 549 (Okla. 1956). Here, Plaintiffs argue that Defendants cannot rely on the bar because they concealed facts relevant to Plaintiffs' causes of action. Plaintiffs assert three primary acts of concealment or fraud. First, they maintain the City was complicit in the erroneous grand jury report that blamed the victims, rather than the white mob, for the destruction in Greenwood.

---

**5.** We note that "federal courts possess the power to use equitable principles to fashion their own tolling provisions in exceptional situations in which state statutes of limitations eradicate rights or frustrate policies created by federal law." *Rodriguez v. Holmes,* 963 F.2d 799, 805 (5th Cir.1992); *see also Tomanio,* 446 U.S. at 485, 100 S.Ct. 1790 (holding that federal courts should not apply state statute of limitations and tolling rules that are "inconsistent with the federal policy underlying the cause of action under consideration") (quoting *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 465, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)). The Court in *Tomanio* found that the failure of New York to toll an "action during the period in which a litigant pursues a related, but independent cause of action" did not frustrate the federal policy goals—compensation, deterrence, uniformity and federalism—under § 1983. *Tomanio,* 446 U.S. at 486, 100 S.Ct. 1790. Likewise, recognizing the broad equitable tolling available to a plaintiff under Oklahoma law, we do not find the Oklahoma statute of limitations contrary to the policy underlying § 1983.

Second, they contend the City failed to investigate or take action against the lawless behavior of the mob and that the failure was, in essence, an act of concealment. Third, Plaintiffs claim that the disappearance of documents and files from the Oklahoma National Guard, the County Sheriff, and the Tulsa Police Department constitutes active concealment of information. They allege that these combined acts represent the "conspiracy of silence" referenced in the Report. *See* Okla. Stat. tit. 74, § 8000.1.4 (West 2002).

On its face, Plaintiffs' argument is compelling. As stated previously, however, the record suggests, and it is undisputed, that substantial information regarding government involvement in the disturbance was available at the time of the Riot. Specifically, Plaintiffs do not dispute that Riot victims filed over one hundred lawsuits seeking redress for property and other losses. One lawsuit reached the Oklahoma Supreme Court in 1923. In its decision, the court described the Riot scene as follows.

> A large number of white men ... broke into a hardware store, a pawnshop, and another place where arms were kept, and armed themselves with guns, revolvers, and ammunition, and in a short while after the firing occurred at the courthouse the streets were full of armed white people. Two or three hundred armed men assembled around the police station and were sent out to different parts of the town ostensibly to guard the town. From that time until about 9 or 10 o'clock the following day there was a great deal of shooting, especially in the negro section of the city, and a number of men were killed.... About daylight on the morn [sp] of June 1st, at the sound of a whistle, shooting became rather general and continued for some time. Armed white men, described as traveling in groups of from a dozen to twenty, rounded up the negroes found in the section where the fires were burning and took, or sent, them to the convention hall, where they appear to have been detained. A number of witnesses testified that these groups of white men, many of them wearing police badges and badges indicating they were deputy sheriffs, after removing the negroes from the buildings, went inside the buildings, and, after they left, fires broke out inside the buildings. By 9 o'clock, buildings were burning in every part of the negro section of the city. *Redfearn v. American Central Ins. Co.,* 116 Okla. 137, 243 P. 929, 929–30 (1926).

Likewise, in the immediate aftermath of the Riot, Plaintiff Barney Cleaver sued the ex-mayor of Tulsa, as well as its police chief. In his complaint, he opined that his detention during the Riot "was affected by agents, servants, and employees of the defendant city and by the direction of the officials above named and mentioned." Plaintiff Ruth Calhoun, suing for damage to her property in 1923, averred that her losses were the "proximate and immediate result and consequence of the conspiracy, illegal acts of omission and commission of the defendant City...."

Plaintiffs do not dispute the veracity of these documents. Rather, they maintain the complaints were futile and confirm that not a single African–American recovered any damages for their losses. While that is true, and certainly tragic, it is not relevant to the narrow issue presented here: whether the District Court abused its discretion in finding, based on undisputed evidence, that Defendants' alleged concealment did not bar Plaintiffs from uncovering essential information about their claims. Finding that ample information existed about their claims in the aftermath

of the Riot,[6] we hold, based on our review of the record, that the court did not abuse its discretion when it rejected tolling based on Defendant's concealment.

### 2. Detrimental Reliance

■■ In the District Court, Plaintiffs maintained they relied to their detriment on Defendants' promises of rebuilding and, as a result, are entitled to tolling of the statute of limitations. *See Jarvis*, 732 P.2d at 472 (noting that tolling is appropriate where defendants provide "assurances ... reasonably calculated to lull the plaintiff into a sense of security"); *see also Fischer v. Atlantic Richfield Co.*, 774 F.Supp. 616, 619 (W.D.Okla.1989) (holding defendant estopped to plead limitations defense where it made "unfulfilled promises to plaintiffs"). The second amended complaint, as well as the arguments in Plaintiffs' briefs, make clear, however, that the racial hostility of the day made it wholly unreasonable for Plaintiffs to rely on any promises of restitution. Indeed, the City of Tulsa imposed zoning restrictions shortly after the Riot which crippled the victims' ability to rebuild. After courts declared those restrictions unconstitutional, the City refused to provide any compensation. Thus, the District Court did not err in rejecting tolling on this basis.

### 3. Extraordinary Circumstances

■■ In the appropriate case, exceptional circumstances may justify tolling a statute of limitations. *United States v. Clymore*, 245 F.3d 1195, 1199 (10th Cir. 2001); *see also Van Tu v. Koster*, 364 F.3d 1196, 1199–1200 (10th Cir.2004) (considering application of equitable tolling where victims of the My Lai massacre raised

claims twenty-eight years after their injuries occurred). Here, Plaintiffs argue that a combination of exceptional circumstances justify tolling, including: an openly hostile racial environment, denial of responsibility by government officials, the grand jury's exoneration of white rioters, and its indictment of African–American victims.

A review of the materials attached to the Report makes clear that at the time of the Riot the victims were powerless against the white majority. Meaningful access to the courts was denied, as was any ability to obtain damages for property losses. Also, a widespread fear of reprisals pervaded the African–American community. We agree with the District Court that, in the immediate aftermath of the Riot and for several decades thereafter, extraordinary circumstances justified tolling the statute of limitations.

Fundamentally, however, the issue is whether, based on the allegations in the complaint and the record, those circumstances existed through the issuance of the Report in 2001. In making this determination, we need not pinpoint an exact date when the exceptional circumstances ended. Rather, the judgment must stand if, based on the undisputed facts available, those circumstances ended sometime prior to February 2001. *Cf. Van Tu*, 364 F.3d at 1199–1200.

As stated above, evidence suggesting the City and State's involvement in the Riot was available in its immediate aftermath and, at the very least, upon publication of *Death In A Promised Land* in 1982. While exceptional circumstances may have prevented victims from seeking

---

**6.** We note that the standard for determining whether a federal claim has accrued is objective. *See Anixter v. Home–Stake Prod. Co.*, 947 F.2d 897, 899 n. 5 (10th Cir.1991), *vacated sub nom. on other grounds, Dennler v. Trippet,*

503 U.S. 978, 112 S.Ct. 1658, 118 L.Ed.2d 382 (1992). Thus, if facts giving rise to a claim were available generally, but simply unknown to these particular plaintiffs, tolling does not apply.

timely legal redress based on that evidence, the emergence of civil rights legislation in the 1960s gave them the ability to do so. In fact, Plaintiffs neither allege nor even imply that they were prohibited from accessing the courts in the 1970s, 1980s, or 1990s. Thus, finding the two required elements of information and access satisfied, the District Court did not abuse its discretion in holding that the exceptional circumstances which tolled the statute of limitations immediately after the Riot had dissipated sufficiently to trigger running of the statute at some point prior to 2001.[7]

## IV. CONCLUSION

The Tulsa Race Riot represents a tragic chapter in our collective history. While we have found no legal avenue exists through which Plaintiffs can bring their claims, we take no great comfort in that conclusion. As the Supreme Court has recognized, "[i]t goes without saying that statutes of limitations often make it impossible to enforce what were otherwise perfectly valid claims. But that is their very purpose, and they remain as ubiquitous as the statutory rights or other rights to which they are attached or are applicable." *United States v. Kubrick,* 444 U.S. 111, 125, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). The judgment of the United States District Court for the Northern District of Oklahoma is **AF-FIRMED.**

---

7. In the District Court, Plaintiffs also urged tolling based on vindication of the public interest and the State's promise of reparations after the Report issued. Because they failed to raise those issues in their appellate briefs, we deem them waived. *See State Farm Fire & Cas. Co. v. Mhoon,* 31 F.3d 979, 984 n. 7 (10th Cir.1994). In addition, in light of our disposition on the statute of limitations issue, we need not address the remainder of Plaintiffs' arguments on appeal.