**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 29 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MICROSOFT, a Washington
corporation,

     Plaintiff-Appellee,

v.

MBC ENTERPRISES, a Utah limited
liability company; JAMES D.
CRAGHEAD; STEVE BLACKBURN;
MARIANNE BLACKBURN,

     Defendants-Appellants.

No. 04-4017

(D.C. No. 2:00-CV-217-PGC)

(D. Utah)

---

**ORDER AND JUDGMENT** *

---

Before **KELLY**, **BALDOCK**, and **BRISCOE**, Circuit Judges.

Defendants MBC Enterprises, James D. Craghead, Steve Blackburn, and

Marianne Blackburn appeal the district court's grant of summary judgment in

favor of plaintiff Microsoft on its claims for trademark infringement and

copyright infringement arising out of defendants' distribution of allegedly

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

counterfeit Microsoft software programs. Defendants also appeal the award of attorney fees to Microsoft, as well as the permanent injunction prohibiting defendants from engaging in certain types of business activities. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, reverse the grant of summary judgment, vacate the statutory damages award, the fee award, and the permanent injunction, and remand for further proceedings.

I.

Microsoft is a developer and licensor of computer software, including Windows, Office, and NT software, and owns valid trademarks and copyrights in connection with these products. MBC is a Utah limited liability company with its principal place of business in Salt Lake City. Marianne Blackburn, a 99% owner and managing member of MBC, is primarily responsible for MBC's financial functions, including ensuring the company's accounts are balanced and sufficiently funded. James Craghead, who is married to Marianne Blackburn, is a 1% owner and member of MBC and is responsible for managing MBC's operations, including acquisition, inspection, and distribution of software. Steve Blackburn, the brother of Marianne Blackburn, works for MBC as an independent contractor.

MBC is engaged in the wholesale distribution of computer software and paraphernalia, and its primary customer base is allegedly comprised of small

2

manufacturers of personal computers. According to MBC, the majority of its purchases and sales have been of Microsoft original equipment manufacturer (OEM) software, i.e., Microsoft software initially distributed by Microsoft to major manufacturers of computer hardware and then resold by those manufacturers in the open market. MBC is not licensed or authorized by Microsoft to distribute Microsoft software, and it does not check to see if the dealers or brokers to whom it sells software are licensed by Microsoft. Nor does MBC typically purchase software from Microsoft-licensed vendors.

Defendants allege, however, that each piece of Microsoft software sold by MBC is authentic. Craghead personally authorizes each purchase of software by MBC and takes certain steps to verify the authenticity of the Microsoft software. Craghead visits Microsoft's piracy web site and news web sites on a daily basis to check for new guidelines to verify the authenticity of Microsoft software. Utilizing those guidelines, he inspects each piece of Microsoft software purchased by, among other things, (a) examining the hologram on the CD or its inner ring, (b) inspecting the heat-sensitive strip woven into the fabric of each software manual or COA, (c) inspecting the holographic thread woven into each manual or COA, and (c) inspecting manuals, COA's and licenses for appropriate watermarks. Craghead allegedly has personally inspected thousands of copies of Microsoft software to determine if they possess all of Microsoft's published

3

security protections. According to Craghead, MBC receives counterfeit software once or twice a week. When a piece of counterfeit software is received, MBC returns it to the seller with a label expressly indicating it is counterfeit. Craghead also regularly sends e-mail messages to Microsoft regarding what he believes are counterfeit software products. Based upon his experience in the industry, including his reading and research of Microsoft's published articles regarding counterfeit software, he alleges "that neither [he] nor MBC . . . violated any copyright or trademark of Microsoft." App. at 2548.

Microsoft filed this action, alleging, in pertinent part, that defendants had (a) purchased counterfeit Microsoft Windows 98 and Office software from Bantech, a Texas company, and resold it, and (b) sold counterfeit Microsoft NT Server software to Mr. Software, a Michigan company. Based upon this alleged misconduct, Microsoft asserted a variety of federal and state claims, including copyright and federal trademark infringement.

Following discovery, the parties filed cross-motions for summary judgment on Microsoft's claims. The district court, after hearing oral argument on the motions, granted summary judgment in favor of Microsoft on its copyright and federal trademark infringement claims and awarded Microsoft statutory damages, fees and costs. The district court also issued a permanent injunction prohibiting defendants from engaging in a wide variety of business activities related to

4

Microsoft products.

## II.

### *District court's summary judgment ruling*

In granting summary judgment in favor of Microsoft on its copyright and federal trademark infringement claims, the district court concluded "[t]he undisputed facts . . . indicate[d] that MBC repeatedly distributed counterfeit Microsoft products in the marketplace, including Windows 98, Windows NT, and Microsoft Office products . . . ." App. at 1038. The court's summary of relevant facts pointed to what it suggested was uncontroverted evidence regarding MBC's software transactions with Bantech and Mr. Software. On appeal, defendants contend the court's conclusion was erroneous because it was the result of improper fact-finding by the district court regarding (1) whether MBC purchased counterfeit software from Bantech and resold it; (2) whether MBC sold counterfeit Windows NT to Mr. Software; and (3) the level of willfulness of the acts allegedly committed by MBC. Defendants contend they submitted sufficient evidence to create genuine issues of material facts on all three issues and that, as a consequence, the district court erred in granting summary judgment in favor of Microsoft.

We review the district court's summary judgment ruling de novo, applying the same standard as the district court. See Alexander v. Oklahoma, 382 F.3d

5

1206, 1215 (10th Cir. 2004). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We "view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the nonmoving party." Combs v. PriceWaterhouseCoopers LLP, 382 F.3d 1196, 1199 (10th Cir. 2004).

*Bantech* – In its summary judgment order, the district court summarized what it concluded were the relevant facts regarding MBC's relationship with Bantech. The district court noted (a) between 1998 and early 2000, MBC purchased thousands of units of purported Microsoft software from Bantech, (b) the FBI's examination of Bantech's records, following a February 28, 2000 search of its offices, indicated the prices MBC was paying Bantech for the units of software were drastically lower than the suggested retail prices for those units, (c) the FBI's examination of Bantech's records indicated that Bantech, in turn, obtained the purported Microsoft software exclusively from Singapore at prices that were again drastically lower than suggested retail prices, and (d) several hundred units of counterfeit Microsoft software were found during the search of Bantech's offices, including 300 units of counterfeit Windows software that were packaged and labeled for FedEx shipment to MBC's address.

6

Although these stated facts are, for the most part, verified by the record, we conclude there are genuine issues of material fact that preclude the entry of summary judgment. There is a genuine issue of material fact concerning whether Bantech in fact obtained all of the software it sold to MBC from Singapore. On this point, defendants have submitted evidence (i.e., invoices addressed to Bantech) suggesting that, during the relevant time period, Bantech regularly purchased Microsoft software from dealers in the United States. Although Microsoft contends all of these invoices could not account for the large number of software units sold by Bantech to MBC, it nevertheless raises an issue of fact concerning the source of software ultimately purchased by MBC, and, in turn, the number, if any, of counterfeit units of software sold by MBC.

Even assuming Bantech did obtain all of the software it sold to MBC from Singapore, we conclude there is a genuine issue of material fact regarding whether any of those units were indeed counterfeit. On this issue, Microsoft points to two pieces of circumstantial evidence: (1) the fact that several hundred counterfeit cd's were found at Bantech's office, including approximately 300 packaged for shipment to MBC; and (2) the large disparity between the prices paid by Bantech, and in turn MBC, for the software and the normal retail prices for the software. Although we agree that a jury reasonably could infer from this evidence that all of the software at issue was counterfeit, defendants have

7

produced evidence that counters that inference and from which a jury reasonably could conclude that MBC purchased only authentic Microsoft software. In particular, Craghead stated in declarations that (a) he personally inspected every piece of software purchased by MBC to ensure it was authentic, (b) at no time did MBC purchase any counterfeit Microsoft software from Bantech, (c) the normal wholesale market prices for authentic Microsoft software were substantially lower than the normal retail prices cited by Microsoft and the FBI, and (d) he learned, through Bantech's counsel, that United States Customs had withheld a shipment of Windows software from Bantech's Singapore inspector, and that Microsoft was allowed to inspect approximately 30-50 units and determined they were authentic. Moreover, it is uncontroverted that no counterfeit units of software were found during a search of MBC's offices, and there is no evidence of counterfeit software being obtained from any of MBC's customers (other than Mr. Software, and that evidence will be discussed below).

Assuming Bantech shipped counterfeit units of software to MBC, Microsoft points to no specific evidence that MBC actually resold that software. Microsoft instead relies on inferences to be drawn from the discovery of counterfeit software in Bantech's offices. In light of the evidence produced by defendants and outlined above, we conclude there is a genuine issue of material fact concerning whether MBC resold any counterfeit software received from Bantech,

8

or whether, instead, any such software was returned by MBC to Bantech.

*Mr. Software* – The district court also concluded the uncontroverted evidence established that MBC sold two units of counterfeit Microsoft software, and possibly more, to Mr. Software. Defendants assert the evidence on this issue was controverted and that the court essentially engaged in improper fact-finding.

Although it is uncontroverted that two counterfeit units of Windows NT Server software were found in the possession of Mr. Software, the critical issue is whether they were purchased from MBC or another source. To support its assertion that the counterfeit software came from MBC, Microsoft relied heavily on the deposition testimony of Peter Swift, a representative of Mr. Software. During direct examination by Microsoft's counsel, Swift was asked whether Mr. Software had "any Microsoft Windows NT software and components from any source other than MBC in its possession on or about June 15th of 2000," i.e., when the two units of counterfeit software were discovered. App. at 2063. Swift responded: "I would say no." Id. Swift further testified that he was assured by an MBC representative named "Joey" that the Microsoft NT Server software was genuine. Id. at 2064. During cross-examination by defendants' counsel, Swift again indicated he purchased the counterfeit units from a person named "Joey," but this time acknowledged that Joey worked for a company named Jalco. Id. at 2643-44. Further, Swift testified: "I don't believe that we ever did get any

9

counterfeit [software] from MBC." Id. at 2640. During redirect, Swift again testified that "Joey" worked for Jalco, but stated he thought that "Jalco went out of business probably in the '98, '99 era, if I remember right," and that he therefore acquired the counterfeit software from MBC. Id. at 3825.

To counter the damaging portions of Swift's deposition testimony, defendants not only pointed to Swift's own internally inconsistent statements (outlined above), but also to declarations from Craghead. In particular, Craghead denied that MBC sold the two confirmed pieces of counterfeit software to Mr. Software and asserted that MBC's invoices to Mr. Software supported this conclusion. Craghead further alleged the two counterfeit pieces of software were likely purchased by Mr. Software from Jalco. According to Craghead, MBC was aware that Jalco was dealing in counterfeit software.

Finally, there appears to be some disparity between at least one, and possibly both, of the two units of counterfeit software and the MBC invoice allegedly related (in Microsoft's view) to the sale of the two units. According to Microsoft, one of the units of counterfeit software was a so-called full version of Windows NT Server software intended for five users. Id. at 1601, 2042. The MBC invoice cited by Microsoft, however, indicates the software sold by MBC to Mr. Software was something other than a full version ("CD only media") and was intended for ten users rather than five. Id. at 2645. In addition, there appears to

10

be some question whether the other unit of counterfeit software, which was intended for ten users, accurately matched the description listed on MBC's invoice. Id. at 2642 (deposition testimony of Swift indicating counterfeit unit did not say "NFR," as indicated on MBC's invoice).

Viewing this evidence in the light most favorable to defendants, we conclude a genuine issue of material fact exists regarding whether the two units of counterfeit software came from MBC or Jalco. Although a jury reasonably could conclude, based on Swift's testimony, that the units came from MBC, not only would the jury have to disregard the inconsistent portions of his deposition testimony, it would also have to reject Craghead's declarations. Thus, the court erred in concluding the uncontroverted evidence established that the two counterfeit units came from MBC.

*Defendants' level of willfulness* – The district court concluded defendants engaged in "knowing infringement" of Microsoft's copyrights and trademarks. Based upon this conclusion, the court assessed a total of $990,000 in damages: "$430,000 in statutory damages for copyright and trademark infringement related to the Windows 98 software (damages on one copyright and four trademarks); $330,000 for infringement related to the Microsoft Office product (damages on one copyright and three trademarks); and $230,000 in statutory damages for infringement related to Windows NT (damages on one copyright and two

11

trademarks) . . . ." App. at 1040.

On appeal, defendants contend the evidence relating to their intent was controverted and that the district court improperly found facts. We agree. As outlined in detail above, we conclude there are genuine issues of material fact concerning whether MBC actually sold any units of counterfeit Microsoft software. Moreover, we note that defendants submitted substantial evidence (primarily through Craghead's declarations) indicating MBC had in place a careful system for determining whether software it was considering buying was authentic, and that any counterfeit software detected by Craghead was returned to the potential seller.

We conclude the district court erred in granting summary judgment in favor of Microsoft on its copyright and federal trademark infringement claims.[1]

### *Statutory damages/fee award/permanent Injunction*

Having concluded the district court erred in granting summary judgment in

---

[1] Our conclusion that the district court erred in granting summary judgment in favor of Microsoft renders moot the following issues raised by defendants on appeal: (1) whether the court erred in considering alleged hearsay evidence submitted by Microsoft; and (2) whether the court violated defendants' right to a jury trial by awarding statutory damages to Microsoft under the Copyright Act and the Lanham Act. In the event the case proceeds to trial on remand, however, we note with respect to the damages award under the Copyright Act, 17 U.S.C. § 504, and the Lanham Act, 15 U.S.C. § 1117, the Supreme Court has held the right to a jury trial under the Seventh Amendment attaches. See Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 353-55 (1998) (copyright); Dairy Queen v. Wood, 369 U.S. 469, 477-79 (1962) (trademark).

12

favor of Microsoft, we must also vacate the district court's award of statutory damages under the Copyright Act and Lanham Act, the district court's award of costs and attorney fees under § 505 of the Copyright Act, and the permanent injunction prohibiting defendants from engaging in various conduct related to Microsoft software.

*Modification of discovery order*

The final matter we must consider is whether the district court erred in resolving a discovery dispute between the parties. Prior to the entry of summary judgment, the magistrate judge, acting pursuant to defendants' motion to compel, "ordered Microsoft to provide [to defendants] all methods and manners Microsoft employ[ed] to detect counterfeit software." Aplt. Br. at 14. More specifically, the magistrate judge ordered Microsoft to respond to defendants' interrogatories asking it to "[i]dentify all published and unpublished security features, procedures and measures used by [it] in the production and identification of [its licensed] software," as well as "all tools that [it] use[d] to determine whether or not an item claimed to be a Microsoft product . . . [wa]s genuine or counterfeit." App. at 597; see id. at 749. The magistrate judge also ordered Microsoft to "provide a privilege log of documents constituting the information [it] made available to [the] United States Customs Office for the inspection of Microsoft products including its policies and procedures" for detecting counterfeit software. Id. at

13

752.

Microsoft objected to the magistrate judge's order, arguing the "covert security features and various tools" it used to detect counterfeit software were "highly sensitive" and if they were revealed to defendants they could "eventually find [their] way into the market place, and harm Microsoft." Id. at 874. Thus, Microsoft suggested it be required to reveal only "the reasons why the particular software units at issue in this case [we]re counterfeit." Id. As for any security information it had provided to the United States Customs Office, Microsoft asserted as follows: "While Microsoft's anti-piracy team does occasionally provide training or product identification information to U.S. Customs in order to better educate those officials on the identification of counterfeit software, Microsoft does not keep a particular archive or record of information which has been given to U.S. Customs historically." Id. at 873-74.

During a hearing on Microsoft's objections, Microsoft asserted it had provided defendants with an expert report from Microsoft employee Greta Climer explaining "the reasons why the two software titles [Windows 98 and a Windows NT product] that [we]re at issue in th[e] case" were considered to be counterfeit. Id. at 4270. More specifically, Microsoft asserted Climer's expert report "provide[d] detail as to three or four [security] points or five [security] points on each piece of software." Id. at 4272. Microsoft argued it was "going to live or

14

die by what [it] put in Ms. Clim[]er's expert report," and thus the disclosure of any other unrelated security features was irrelevant and unnecessary. Id. at 4276. The district court suggested that Microsoft stipulate that its software contained a variety of security features, but that the alleged counterfeit software failed to match a few of those security features. Ultimately, the court stated:

> On the security feature issue, we've now come up with a Microsoft stipulation. I'm going to conclude there that stipulation resolves the need to have Microsoft disclose additional security features; also disclosed the expert report of Greta Clim[]er. So I don't think it is a question of affirming or denying [the magistrate judge's] ruling. I think events have moved beyond his ruling. And I think we now have an understanding that in light of the stipulation, information is so dubious relevance and burden on Microsoft far outweigh any probative value at trial. So I think the security features issue will be resolved along those lines of the stipulation that I have outlined today.

Id. at 4288-89.

With respect to the customs-related information, the district court asked Microsoft's counsel "what information is out there, and can we look at a privilege log?" Id. at 4290. Microsoft's counsel responded that "Microsoft's investigators and legal department work quite closely with Customs agents, probably on a day-to-day basis on . . . on-going criminal investigations," and thus "it would be an incredibly burdensome task" "in order to provide a privilege log of [such] communications." Id. The court then asked if there was "a current company policy about how Microsoft interacts with Customs?" Id. at 4291. Microsoft's

15

counsel responded there was "nothing in writing," id., and there was simply "a large anti-piracy team at Microsoft who provide[d] assistance and work[ed] with Customs on ongoing matters." Id. at 4292. Lastly, the court asked Microsoft's counsel if there was "somebody at Microsoft that [defendants] could depose to get information about how [Microsoft] interact[s] with Customs?" Id. Microsoft's counsel responded that two Microsoft employees, Greta Climer and Pat Mueller, would have such information and could be deposed by defendants. Based upon these representations from Microsoft's counsel, the district court concluded:

> What I'm going to do is [the magistrate judge's] ruling, as I understood it, was to make sure if there [wa]s any company policy, that Microsoft turn it over. And [Microsoft's counsel] represented as an officer of the Court there [wa]s no written company policy. There has been a good faith investigation to try to comply with [the magistrate judge's] order and I think that takes care of the need to provide Customs information in written form.
> There is, however, going to be a deposition of a Mr. Pat Mu[ell]er who will be able to answer question about all of that. And I understand what [defendants' counsel] is saying about wanting to go into that deposition prepared, but if there is, it would seem to me virtually impossible for Microsoft to disclose some of the things that [defendants' counsel] thinks [the magistrate judge] was ordering to be produced, the interactions with Customs agents, there must be hundreds of border stations around the country that would be not feasible. So I think that the deposition of Mr. Mu[ell]er would be and I guess Ms. Clim[]er would be sufficient to give the defendants the information that they need.

Id. at 4299.

The district court issued a two-page written order modifying the magistrate judge's order in the following relevant respects:

16

Regarding the requested disclosure of software security features, Microsoft will stipulate to the effect that: "Microsoft software contains a variety of different features, including some that are specifically designed for security. Microsoft stipulates that MBC's products matched all those features, except those specifically identified in Ms. Cl[i]mer's report or deposition." In light of such a stipulation, Microsoft need not disclose information on other security features.

Regarding customs information, Microsoft will search Mr. Mueller's [a Microsoft investigator's] correspondence file to see if there is anything that might be viewed as a company policy with regard to interactions with the U.S. Customs Service and will produce such documents. No further documentation is required. Mr. Mueller may be deposed on these issues, but he is not required to disclose specific information that might harm on-going criminal investigations.

Id. at 898.

On appeal, defendants contend the district court erred in modifying the magistrate judge's discovery order. According to defendants, information about the security features employed by Microsoft is necessary to allow them to fully defend against the copyright and trademark infringement claims. For example, they note it would be relevant for a finder of fact to know if there were unpublished security features not known by an informed customer (and thus not detectable even using reasonable and thorough detection methods). Defendants also assert that revelation of the security-related information is necessary to enable them to retain an expert to actually examine the alleged counterfeit software at issue and opine whether it was, in fact, counterfeit. As for the customs-related information, defendants argue full disclosure was important

17

because they "had possession of a document from U.S. Customs which resulted in the release of Bantech software from Singapore after review by Microsoft," and "[w]ithout th[e requested] information," they "were unable to utilize the Customs report . . . at the deposition of Microsoft." Aplt. Br. at 39.

Generally speaking, a district court must defer to a magistrate judge's discovery order unless it is determined to be clearly erroneous or contrary to law. See Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A); but see 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 3069 (2d ed. 1997) (noting that discovery disputes "might better be characterized as suitable for an abuse-of-discretion analysis"). Under this standard, the district court must affirm the order of the magistrate judge unless, in light of all the evidence, the district judge is left with the definite and firm conviction that a mistake has been committed. See Ocelot Oil Corp. v. Sparrow Indus., 847 F.2d 1458, 1461-62 (10th Cir. 1988). We in turn review a district court's discovery-related rulings for abuse of discretion. Ahrens v. Ford Motor Co., 340 F.3d 1142, 1145 (10th Cir. 2003); GWN Petroleum Corp. v. OK-Tex Oil & Gas, Inc., 998 F.2d 853, 858 (10th Cir. 1993).

Although we have some concern whether the district court afforded the proper degree of deference to the magistrate judge's discovery order, we ultimately conclude, given the events that transpired during the hearing on

18

Microsoft's objections, that the district court did not abuse its discretion in modifying the discovery order. In particular, we agree with the district court that Microsoft's stipulation during the hearing, i.e., that the software units at issue failed to match only a few designated security features, rendered the disclosure of any other unrelated security features unnecessary. As for the customs-related information, we conclude Microsoft adequately demonstrated during the hearing that it attempted in good faith to comply with the magistrate judge's discovery order and that such efforts obviated the need to provide customs-related information in written form. Thus, we conclude the district court rationally limited the scope of that discovery to documents and information in the possession of Microsoft investigator Pat Mueller. Although defendants now assert they were unable to effectively depose Mueller without access to all customs-related information they originally requested, they fail to explain precisely how the district court's limitations produced this result. Moreover, they fail to explain why they could not have deposed a representative from the Customs Service to testify about these matters generally, or in particular about any shipments of software from Singapore to Bantech that may have been seized and examined for authenticity.

The decision of the district court granting summary judgment in favor of Microsoft is REVERSED, the award of statutory damages, costs, and fees, and the

permanent injunction issued by the district court are VACATED, and the case is REMANDED for further proceedings.

Entered for the Court

Mary Beck Briscoe
Circuit Judge