**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 9, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LEGACY CROSSING, L.L.C.,

      Plaintiff - Appellant,

v.

TRAVIS WOLFF & COMPANY, L.L.P.,

      Defendant - Appellee.

No. 06-6210
(D.C. No. 05-CV-455-L)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **EBEL**, Circuit Judges and **MURGUIA**,[**] District Judge.

In this diversity action, Plaintiff-Appellant Legacy Crossing, LLC ("Legacy Crossing") appeals from the district court's grant of summary judgment in favor of Defendant-Appellee Travis Wolff & Company, LLP ("TWC"). The district court held that Legacy Crossing's state law claims against TWC for fraud, negligence/professional malpractice, and violation of the Oklahoma Consumer Protection Act were barred as untimely under the applicable Oklahoma statute of

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**]The Honorable Carlos Murguia, District Judge, United States District Court for the District of Kansas, sitting by designation.

limitations. The district court also declined Legacy Crossing's invitation to toll the statute of limitations. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

Legacy Crossing is the owner and operator of an apartment complex in Oklahoma City. As an LLC, it is organized under the laws of Oklahoma with its principal place of business in Oklahoma. TWC is an accounting and financial advisory firm organized under the laws of Texas with a principal place of business in Dallas, Texas.

Construction of Legacy Crossing's apartment complex began in February 2000, and was completed in August 2001. Legacy Crossing employed Barry, Bette & Led Duke, Inc. ("BB&L") as the contractor on the project. In conjunction with construction, Legacy Crossing obtained a commitment from the United States Department of Housing and Urban Development ("HUD") to guarantee a construction loan for the project. One requirement of that commitment was that Legacy Crossing and BB&L enter into a form contract that required BB&L to furnish a "Contractor's Certificate of Actual Cost" before BB&L could receive final payment. BB&L was further required to furnish a report from an independent public accountant that BB&L's certification of the actual costs was true and accurate. On February 9, 2000, Legacy Crossing and

BB&L entered into a construction contract.

BB&L thereafter hired TWC to conduct an independent audit, and on February 18, 2002, TWC submitted a final revised report to HUD certifying that the Contractor's Actual Cost of Construction submitted by BB&L was correct. Legacy Crossing also received a copy of the report at that time. Legacy Crossing was nonetheless unhappy with, and questioned, the amount charged for "General Requirements"[1] expenses. At $1.952 million, the amount charged for general requirements was nearly $900,000 above prior estimates. Consequently, Legacy Crossing disputed the general requirement charges and requested supporting documentation from BB&L regarding the amount of overhead.

On March 6, 2002, BB&L attempted to respond to Legacy Crossing's concerns by sending it a letter enclosing a copy of an auditor's worksheet showing items of expense by trade, a letter to TWC explaining BB&L's reasons for several variances from the original HUD budget, and a copy of a detailed computer report showing expenses by line item. Legacy Crossing deemed BB&L's letter unresponsive. Legacy Crossing expressed its displeasure with the amount of the general requirements expenses to HUD representatives, who found nothing improper about TWC's report. Despite Legacy Crossing's dissatisfaction, on March 14, 2002, it went forward with the HUD closing because it believed that

---

[1] The account for general requirements expenses represents general items of overhead that BB&L charged to the project.

further delays would harm the construction project.

Instead of holding up the construction project, Legacy Crossing refused to pay an identity of interest fee[2] to BB&L. In response, BB&L filed suit against Legacy Crossing in federal court alleging that Legacy Crossing had breached several agreements it had entered into with BB&L. Legacy Crossing then cross-claimed for breach of contract and "[a]ccounting, [r]estitution, and [d]amages." In its cross-complaint, filed May 16, 2002, Legacy Crossing alleged:

> 34. Legacy Crossing believes that some portion of the "General Requirement" charges that were paid to Plaintiff included charges for general overhead expenses that were not directly connected to the construction of the project. Legacy Crossing previously requested that Plaintiff provide supporting documentation for such charges to resolve the issue, but Plaintiff refused the request.
> 35. Legacy Crossing is entitled to an equitable accounting to determine whether such costs were proper and/or directly connected to Plaintiff's construction of the apartment complex.

Aplt. App. at 183. In apprising the owners of Legacy Crossing about the litigation, Mike Henderson, Managing Partner of Legacy Crossing, wrote in May 2002:

[BB&L] ha[s] been paid approximately one-half of their profit as

---

[2] Legacy Crossing and BB&L entered into an Identity of Interest Agreement whereby Legacy Crossing would pay a preestablished fee in set increments when BB&L met certain construction thresholds. Under the Agreement, BB&L was also entitled to a 25% share of the difference between the actual cost of construction and $19,267,000 (assuming the cost of the project came in below $19,267,000). Finally, any amount owed to BB&L would be reduced by $750 per day for each building that was not completed by a specified deadline.

called for in the Identity of Interest Agreement. We are now in litigation over the balance of this profit. We have refused to pay this additional profit as called for in the Identity of Interest Agreement until we get a proper accounting of why the general conditions cost ended up being so high. It is my suspicion that their cost certifier [(TWC)] included the general overhead, as allowed by HUD regulations, in the general conditions. Then when the report was initially sent to HUD and HUD noted that there was no general overhead requested in the cost certification BB&L then redid the cost certification adding general overhead back in and redoing the cost certification which HUD allowed. When I questioned HUD on this re-certification they said they did not want to make waves because the contractor had done a good job of construction. While I agree that they did a good job of construction they should not ask us to pay costs twice. As part of our defense on [sic] this litigation we are counter claiming that some of the buildings were completed late and that we can invoke a penalty clause in the Identity of Interest Agreement. We had not intended to invoke this clause until these double-charging suspicions arose.

Id. at 146.

On November 27, 2002, Legacy Crossing responded to interrogatories from BB&L. In response to BB&L's request for the identities of all persons having discoverable information, Legacy Crossing provided the name of Ed Wolff, of TWC, as someone who would have information about "[f]acts relating to certified costs." Id. at 221-22. Moreover, interrogatory 13 was asked and answered, in relevant part, as follows:

**INTERROGATORY NO. 13**: Describe in detail why the audit relating to the Construction Project performed by [TWC] is not a sufficient accounting so that you are demanding in your counterclaim an equitable accounting from [BB&L].

**ANSWER**: . . . Legacy Crossing believes that some portion of the "General Requirement" charges that were paid to [BB&L] included

-5-

charges for general overhead expenses that were not directly connected to the construction of the project. . . . Legacy Crossing is entitled to an equitable accounting to determine whether such costs were proper and/or directly connected to Plaintiff's construction of the apartment complex. In the event such charges were not appropriate, Legacy Crossing is entitled to restitution or damages for all of such over payments.

Id. at 227-28.

Mr. Henderson admits that, on December 20, 2002, counsel for BB&L delivered some documents to counsel for Legacy Crossing. Those documents included TWC work papers underlying its audit of the Legacy Crossing project; counsel for BB&L so informed counsel for Legacy Crossing. Mr. Henderson contends in his affidavit, however, that "until the deposition [of two TWC employees on April 3, 2003], Legacy Crossing did not know that **no other** work papers existed." Id. at 524 (emphasis added). Nonetheless, by January 2, 2003 Legacy Crossing had hired Harry J. Potter as an expert witness to opine on the propriety of TWC's audit. See id. at 251. In a later response to a motion in limine, Legacy Crossing specifically stated that it had hired Mr. Potter "to address . . . the deficiencies of an audit conducted by [TWC] . . . ." Id. at 257. And lastly, in deposition testimony, Mr. Potter admitted that "if you gave me this audit and access to people in mid-February and say, 'Can you find out in a week? . . . 'Can you arrive at your opinion whether this is a good audit or not,' I could do it. So I guess it's possible." Id. at 582.

On November 12, 2003, the lawsuit involving BB&L and Legacy Crossing

was settled, and the parties dismissed their claims with prejudice. Legacy Crossing thereafter filed the present lawsuit against TWC on March 30, 2005 in Oklahoma state court. On April 22, 2005, TWC removed the case to the federal district court based on diversity of citizenship. See 28 U.S.C. § 1332. In its original complaint, Legacy Crossing pressed claims for fraud and negligence/professional malpractice. On June 16, 2005, Legacy Crossing filed an amended complaint, adding a cause of action against TWC for alleged violation of the Oklahoma Consumer Protection Act (OCPA). On September 19, 2005, TWC filed a motion for summary judgment, arguing that all of Legacy Crossing's claims were barred by the applicable statute of limitations and also that Legacy Crossing's claims were barred under the doctrine of claim preclusion. TWC also simultaneously filed a motion to dismiss, arguing that Legacy Crossing's OCPA claim should be dismissed because Legacy Crossing's allegations as to that claim did not satisfy the pleading requirements of Fed. R. Civ. P. 8(a), the OCPA does not apply to professional services or non-customers, and the claim was barred by the applicable statute of limitations.

As mentioned, the district court granted TWC's motion for summary judgment on the grounds that Legacy Crossing's claims were not brought within the requisite statute of limitations. In so doing, it applied the discovery rule for determining when the statute of limitations began to run and determined that Legacy Crossing had the means of discovering or suspecting fraud and negligence

on TWC's part no later than December 2002. The district court declined to apply the doctrine of fraudulent concealment to toll the statute of limitations. Finally, it held that the statute of limitations period for bringing Legacy Crossing's OCPA claim began to run on February 15, 2002 and that fraudulent concealment similarly did not toll that period. As a result of its granting TWC's motion for summary judgment on statute of limitations grounds, the district court did not address the parties' arguments regarding claim preclusion, and it denied TWC's motion to dismiss as moot.

On appeal, Legacy Crossing contends that summary judgment should not have been granted in TWC's favor because there is a genuine issue of material fact as to when Legacy Crossing had the means of discovering the basis for all of its claims. It also maintains that the district court erred in holding as a matter of law that Legacy Crossing had adduced insufficient evidence of fraudulent concealment by TWC.

## Discussion

We review the district court's grant of summary judgment on statute of limitations grounds de novo. Cory v. Aztec Steel Bldg., Inc., 468 F.3d 1226, 1233 (10th Cir. 2006). Summary judgment may be granted where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Hackworth v. Progressive Cas. Ins. Co., 468

F.3d 722, 725 (10th Cir. 2006). In the statute of limitations context, the initial burden is on the moving party to demonstrate that there is no genuine issue of material fact as to the running of the statute of limitations. See Tiberi v. Cigna Corp., 89 F.3d 1423, 1428 (10th Cir. 1996). If that initial burden is met, it then becomes the non-moving party's "burden of proving the existence of facts which, if proven true, would warrant a tolling of the statute[] of limitation[s]." Id.

Because our jurisdiction in this case is premised upon diversity of citizenship, we apply the familiar rule of Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), and look to Oklahoma law to resolve whether claims are barred by the statute of limitations, see Guaranty Trust v. York, 326 U.S. 99, 110 (1945) (holding that statutes of limitations are considered substantive matters for purposes of the Erie doctrine). In so doing, we are "required to apply the most recent statement of applicable substantive state law as pronounced by [Oklahoma's] highest court." Murphy Oil USA, Inc. v. Wood, 438 F.3d 1008, 1012 (10th Cir. 2006). Even if Oklahoma courts have not squarely addressed the very question we confront, "we can anticipate the reaction of the [Oklahoma] courts by the principles of [Oklahoma] case law." Sawtell v. E.I. Du Pont De Nemours & Co., 22 F.3d 248, 250 (10th Cir. 1994). We may also look to the substantive law from other jurisdictions to anticipate what the Oklahoma courts would do if faced with the same predicament. Id.

I.    Legacy Crossing's Fraud Claim

Beginning with Legacy Crossing's fraud claim, the Oklahoma statute of limitations provides that "an action for relief on the ground of fraud" shall be brought within two years "after the cause of action shall have accrued," but that "the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud." Okla. Stat. tit. 12, § 95(A)(3) (2004); see Sade v. N. Natural Gas Co., 483 F.2d 230, 235 (10th Cir. 1973). "The phrase 'Until the discovery of the fraud,' does not necessarily mean until the party has actual notice of the fraud." Walker v. Walker, 310 P.2d 760, 763 (Okla. 1957). Rather, "[f]raud is deemed to be discovered . . . when in the exercise of reasonable diligence it could have been discovered." Id.; Farmers' State Bank of Ada v. Keen, 167 P. 207, 209 (Okla. 1917). In fact, the Oklahoma Supreme Court has explained:

> Where means of discovering fraud are in hands of party defrauded and defrauding party has not covered up his fraud to extent it would be difficult or impossible to discover, party defrauded will be deemed to have had notice of fraud from date means of discovering such fraud came into his hands and fraud will be deemed to have been discovered upon that date.

Matter of Woodward, 549 P.2d 1207, 1209 (Okla. 1976).

Exemplary of these principles is the Oklahoma Supreme Court's decision in McCain v. Combined Commc'ns. Corp. of Okla., 975 P.2d 865 (1998). In that case, two brothers who were terminated from their positions as local television

-10-

anchors sued their former employer in July 1996 for fraud in the inducement of a contract. Id. at 866. Despite being terminated in May 1994, the brothers had continued to receive pay through September 1994. Id. The brothers alleged in their lawsuit that their former employer "failed to disclose to them the termination provisions of the[ir] 1992 [employment] contract and that the oral representations regarding termination were . . . different from those contained in the contract." Id. In order to avoid being barred by the two year statute of limitations, the brothers argued that the September 1994 stoppage in their pay (as opposed to their May 1994 terminations) was the date upon which accrual of the limitations period began. Id. at 867. The court rejected that argument, explaining that "[i]nasmuch as the employees had in their possession . . . copies of all the relevant documents, they clearly had the means and perhaps should have discovered the difference between the terms of negotiations and those of the printed form (or contract)." Id.

Based on the foregoing, it is abundantly clear that Legacy Crossing possessed the means to discover TWC's alleged fraud, at the latest, on January 2, 2003. As of that date, Legacy Crossing had in its possession a copy of the final revised audit report sent by TWC to HUD, the underlying audit workpapers, a copy of an auditor's worksheet showing items of expense by trade, a letter to TWC explaining BB&L's reasons for several variances from the original HUD budget, and a copy of a detailed computer report showing expenses by line item.

Moreover, Legacy Crossing had also hired an expert in accounting specifically to

analyze the methods and accuracy of TWC's audit. Consequently, "the means of

discovering fraud" were in Legacy Crossing's hands no later than that time.[3]

Moreover, contrary to Legacy Crossing's contention, it was not completely

ignorant of its potential claims during the period leading up to January 2, 2003.

In May 2002, Mr. Henderson explained to Legacy Crossing owners that the

company had suspicions of double-charging, that he suspected that BB&L's "cost

certifier included the general overhead . . . in the general conditions," and that

"when . . . HUD noted that there was no general overhead requested in the cost

certification BB&L then redid the cost certification adding general overhead back

in and redoing the cost certification . . . ." Aplt. App. at 146. During litigation

with BB&L, Legacy Crossing stated that it believed "that some portion of the

'General Requirement' charges that were paid to [BB&L] included charges for

general overhead expenses that were not directly connected to the construction of

the project." Id. at 183. And, on November 27, 2002, Legacy Crossing alleged

the same in response to BB&L's interrogatory 13. See id. at 228. Thus, it is

abundantly clear that Legacy Crossing suspected it had paid expenses unrelated to

---

[3] We, of course, express no opinion as to whether Legacy Crossing might have had the means to discover its fraud claim even earlier than January 2, 2003. Thus, it remains an open possibility that in a future case an Oklahoma claimant will be deemed to have had the means to discover fraud in the absence of hiring an expert or possessing all of the audit workpapers.

the construction of its apartment complex, and that TWC had certified those unrelated expenses, long before January 2, 2003.

In sum, we hold that Legacy Crossing had all the information it needed to discover TWC's alleged fraud no later than January 2, 2003. Thus, its fraud claim filed in this case on March 30, 2005 is untimely and barred under the Oklahoma statute of limitations.

In its attempt to avoid the statute of limitations bar, Legacy Crossing argues that it could not have possibly discovered TWC's alleged fraud until April 1, 2003 when it deposed two employees of TWC—Edward A. Wolff, Jr. and David Burton. It contends that the testimony of those two employees revealed that TWC could not identify how BB&L's general requirement charges were confirmed, which methods it used in its sampling, or which items were tested to confirm the general requirement charges. It also claims that it learned during the depositions that Mr. Wolff was not familiar with HUD accounting guidelines, the original records of construction were not used in the audit, and TWC had previously represented BB&L or its principals in other matters. Thus, Legacy Crossing maintains that prior to the April 1 depositions it "did not know that [TWC] had done anything wrong and/or that the [TWC] misconduct was connected to Legacy Crossing's dispute with BB&L." Aplt. Br. at 8. We disagree.

While all of the new information Legacy Crossing gleaned from the April 1

depositions might have been useful in proving a fraud claim, Legacy Crossing did not need it in order to possess the means to discover that an alleged fraud had occurred. In other words, Legacy Crossing seems to confuse the necessary level of information to start the running of the statute of limitations with the necessary level of evidence to win on the merits. With regard to the former, in the fraud context, all that is required is that the plaintiff possess the means to discover that the defendant had knowingly or recklessly made false and material misrepresentations intending that they would be acted upon, which statements caused the plaintiff injury. See McCain, 975 P.2d at 867 (listing the elements of a fraud claim in Oklahoma). Legacy Crossing had long before formed the belief that TWC improperly certified general overhead costs unrelated to the project under review and had obtained information to act on this belief no later than January 2, 2003.

Legacy Crossing also argues that the determination as to when it had the means to discover fraud is a question of fact exclusively for a jury to decide. The Oklahoma courts have indeed explained that "[t]he question of when fraud is discovered or should have been unearthed with the exercise of ordinary diligence is one of fact dependent on the surrounding circumstances, the relationship of the parties, and all other elements peculiar to the cause." Smith v. Baptist Found. of Okla., 50 P.3d 1132, 1138 (Okla. 2002). As demonstrated by McCain, however, the question of when fraud was discovered is not a jury question in absolutely all

circumstances.  See 975 P.2d at 867.

Whether an issue as to the timing of the discovery of fraud must be submitted to a jury is instead determined by the amount and character of the evidence that the party attempting to avoid the statute of limitations bar is able to muster.  In other words, in order to get to a jury, Legacy Crossing must come forth with evidence from which a rational trier of fact could find that it did not have the means to discover fraud until sometime on or after April 1, 2003.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)); see also Sawtell, 22 F.3d at 252.  Legacy Crossing relies exclusively on the allegedly new information it received during the April 1, 2003 deposition.  But even assuming Legacy Crossing gained new information during that deposition, that does not cast doubt on the fact that, on or before January 2, 2003, Legacy Crossing believed that TWC had certified unrelated costs, it possessed numerous documents related to the audit,[4] and it had hired an expert to

---

[4] In an attempt to create a fact question as to the character and content of the documents it had received, Legacy Crossing stated in its response to TWC's motion for summary judgment that TWC had not submitted evidence proving that the documents were what TWC said they were, and that TWC had submitted no evidence that the documents provided actually supported the actual costs of construction.  See Aplt. App. at 498.  What Legacy Crossing fails to grasp is that,

review the audit. As a result, no rational jury could find that Legacy Crossing did not have the means to discover fraud on or before January 2, 2003, and the district court properly granted summary judgment in TWC's favor.

In a final effort to avoid the statute of limitations bar on its fraud claim, Legacy Crossing argues that the limitations period should be tolled because of fraudulent concealment. More specifically, Legacy Crossing contends that TWC concealed its fraud by issuing the fraudulent audit report in the first place and by authorizing BB&L to use the audit report as its expert witness report in the Legacy Crossing/BB&L litigation. There is no doubt that the doctrine of fraudulent concealment operates under Oklahoma law to toll the two-year limitations period for fraud. See Richey v. Westinghouse Credit Corp., 667 F. Supp. 752, 755 (W.D. Okla. 1986); see also Woodward, 549 P.2d at 1209 (explaining that the statute of limitations period begins to run on the date the party defrauded possesses the means of discovering the fraud so long as the "defrauding party has not covered up his fraud"). In order for fraudulent concealment to toll the limitations period, however, the defendant must have

_____

(. . . continued)
as the non-moving party, it bore the burden of demonstrating that there existed a genuine issue of material fact. See Anderson, 477 U.S. at 248-50 & n.4. Thus, it was tasked with bringing forth sufficient evidence from which a jury could find that the documents provided were not what they were purported to be or that they did not actually support the costs of construction. Because Legacy Crossing adduced no such evidence, no genuine issue of material fact as to the character and content of the documents arose.

"commit[ted] some actual artifice to prevent knowledge or some affirmative act of concealment or some misrepresentation to exclude suspicion and prevent inquiry . . . ." Wills v. Black & West, Architects, 344 P.2d 581, 584 (Okla. 1959). Additionally, "the mere failure to disclose that a cause of action exists is not sufficient to prevent the running of the statute." Id.

Neither of the acts of which Legacy Crossing complains were sufficient to constitute fraudulent concealment. The original issuance of the audit report is the very act upon which Legacy Crossing bases its fraud claim. Essentially, Legacy Crossing argues that one act can constitute both fraud and fraudulent concealment at the same time. We believe that under the fraudulent concealment doctrine there must be a separate affirmative act of concealment intended to cover up the original fraudulent act. Otherwise, the exception (tolling for fraudulent concealment) would become the rule. In fraud cases, the limitations period would never begin to run until the defrauding party committed an affirmative act to reveal his fraud. Of course, if the nature of the original fraudulent act was such that it hid the fraud from the defrauded party, then the limitations period would not begin until the fraud was uncovered. See Brookshire v. Burkhart, 283 P. 571, 577-78 (Okla. 1929). But that situation is governed by the statute's instruction that causes of action for fraud do not accrue until the fraud is discovered, not by the fraudulent concealment doctrine. Regardless, that situation is not present here. If anything, TWC's original issuance of the audit report facilitated, rather

-17-

than concealed, Legacy Crossing's discovering the fraud.

TWC's allowing BB&L to issue the audit as an expert report in prior litigation is also not fraudulent concealment. Legacy Crossing argues that it "could draw no other conclusion from this action than that [TWC] did in fact conduct an independent audit pursuant to HUD requirements." Aplt. Br. at 12. We do not find this argument persuasive. Legacy Crossing never explains exactly how BB&L's use of the audit report in the BB&L/Legacy Crossing litigation forced it to conclude that TWC's audit was properly conducted. Use of the audit report likely meant that TWC and BB&L thought the audit was proper, but Legacy Crossing was nevertheless free to disagree. And apparently it did disagree as evidenced by its hiring of Mr. Potter to conduct his own independent analysis. Moreover, BB&L's use of the audit report in no way concealed the fact that TWC had certified approximately $900,000 in overhead expenses that Legacy Crossing believed were unconnected to its project. In sum, BB&L's use of the audit report in prior litigation was not an actual artifice, active concealment, or misrepresentation sufficient to toll the statute of limitations.

II.    Legacy Crossing's Negligence/Professional Malpractice Claim

Our disposition as to the untimeliness of Legacy Crossing's fraud claim largely resolves the timeliness issue as to its negligence and OCPA claims as well. In Oklahoma, the applicable limitations period for negligence claims is two years. See Okla. Stat. tit. 12, § 95(A)(3); Cochran v. Buddy Spencer Mobile

Homes, Inc., 618 P.2d 947, 950 (Okla. 1980). Unlike fraud claims, negligence claims accrue for purposes of the limitations period at the moment in time "when a litigant first could have maintained his action to a successful conclusion." Sherwood Forest No. 2 Corp. v. City of Norman, 632 P.2d 368, 370 (Okla. 1980). Legacy Crossing's negligence claim in this case accrued on March 14, 2002, the date on which the HUD closing and full payment to BB&L occurred, because that is the date upon which Legacy Crossing could have potentially stated a claim for negligence against TWC. See Wynn v. Estate of Holmes, 815 P.2d 1231, 1233 (Okla. 1991) overruled on other grounds by Stroud v. Arthur Andersen & Co., 37 P.3d 783, 795 n.58 (Okla. 2001). Consequently, Legacy Crossing's negligence claim brought on March 30, 2005 is untimely unless the limitations period was tolled.

"[T]he Oklahoma discovery rule tolls the statute of limitations 'until an injured party knows of, or in the exercise of reasonable diligence, should have known of or discovered the injury, and resulting cause of action.'"[5] Alexander v.

_____

[5] While the Oklahoma legislature specifically incorporated the discovery rule into the statute of limitations pertaining to fraud claims, see Okla. Stat. tit. 12, § 95(A)(3), the discovery rule only operates as to other types of claims by judicial fiat, see Lovelace, 831 P.2d at 1217 ("[W]hether the discovery rule should apply to professional negligence actions is a judicial determination which must be made on a case by case basis."). The Oklahoma Supreme Court, however, has "not applied the discovery rule in a broad range of negligence actions." Id. Nonetheless, we need not decide whether the discovery rule applies to Legacy Crossing's negligence claim because even if we apply the rule, that claim is untimely.

-19-

Oklahoma, 382 F.3d 1206, 1217 (10th Cir. 2004) (quoting Lovelace v. Keohane, 831 P.2d 624, 629 (Okla. 1992)) (emphasis omitted). Similar to its fraud claim, Legacy Crossing posits that it could not have known of or discovered the basis for its negligence claim until the April 1, 2003 deposition of Mr. Wolff and Mr. Burton. It also argues that TWC fraudulently concealed its negligence in the same manner it concealed its fraud. We reject Legacy Crossing's argument regarding discovery of its negligence claim for the same reason we rejected that identical argument as to its fraud claim—namely, that Legacy Crossing, exercising reasonable diligence, could have known of TWC's negligence no later than January 2, 2003. We also reject Legacy Crossing's fraudulent concealment argument because neither of the actions on TWC's part of which Legacy Crossing complains constitutes "'false, fraudulent, or misleading conduct' calculated to lull plaintiffs into sitting on their rights." Alexander, 382 F.3d at 1217.

III.   Legacy Crossing's OCPA Claim

Lastly, Legacy Crossing's OCPA claim is governed by the three year limitations period found within Okla. Stat. tit. 12, § 95(A)(2) because it is "an action upon a liability created by statute other than a forfeiture or penalty." See Brashears v. Sight 'N Sound Appliance Ctrs., Inc., 981 P.2d 1270, 1273-74 (Okla. Civ. App. 1999). That cause of action accrued, at the latest, on February 18, 2002, when TWC sent its final revised audit report to HUD, which is alleged to have contained misrepresentations. See Sherwood Forest No. 2 Corp., 632 P.2d at

370; Okla. Stat. tit. 15, § 753 (2006). Resultingly, Legacy Crossing's OCPA claim, which was not brought until June 16, 2005, is barred unless the limitations period was somehow tolled until at least June 16, 2002. Tolling, however, will not save Legacy Crossing's OCPA claim because it could have discovered its injury with reasonable diligence, at the latest, on March 6, 2002, at which time it possessed several supporting documents for the audit and had formed the belief that TWC had certified improper costs. Moreover, TWC's actions did not rise to the level of fraudulent concealment.

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

-21-