FILED
United States Court of Appeals
Tenth Circuit

**March 21, 2011**

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES ALISTAR MERCER-SMITH;
JANET MERCER-SMITH,

     Plaintiffs-Appellants,

v.

NEW MEXICO CHILDREN, YOUTH
AND FAMILIES DEPARTMENT,

     Defendant,

and

DEBORAH HARTZ; MARY DALE
BOLSON; DORIAN DODSON;
REBECCA LIGGETT; ANGELA
DOMINGUEZ; ROLAND TRUJILLO;
CARMELLA ALCON; VERONICA
VALLEJOS; LOU ANN HOEPPNER;
TERESA VIGIL; FLORA ARAGON;
KIMBERLY CRESPIN; BETH
REICH, all in their individual and
official capacities,

     Defendants-Appellees.

No. 10-2053

(D.C. No. CIV-09-00340-JEC)
(D. N.M.)

---

**ORDER AND JUDGMENT**[*]

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Before **BRISCOE,** Chief Judge, **EBEL** and **O'BRIEN**, Circuit Judges.

---

Plaintiffs James Mercer-Smith and Janet Mercer-Smith appeal from the district court's grant of the individual defendants' motion to dismiss and defendant Dr. Beth Reich's motion for summary judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I

### *Factual Background*

Dr. James Mercer-Smith and Dr. Janet Mercer-Smith, both of whom work at the Los Alamos National Laboratory in New Mexico, have three daughters, Julia, Rachel, and Alison. The Mercer-Smiths adopted Julia in 1987. During the adoption proceedings, Janet gave birth to Rachel, who is eight months younger than Julia. In 1992, Janet gave birth to Alison.

In 1989, when Julia was two or three years old, she began having significant behavioral problems that required treatment by medical professionals. While Julia received professional counseling, a former babysitter and Janet Mercer-Smith's mother began claiming that James Mercer-Smith had sexually abused his daughters. In 1989 and again in 1992, Janet's mother complained to the New Mexico Children Youth and Families Department ("CYFD") regarding James' alleged sex abuse. CYFD investigated these allegations and ultimately concluded that Janet's mother's allegations were "unsubstantiated" and

"unconfirmed." ROA Vol. 1, at 43–44.

In 2000, then twelve-year old Rachel required medical treatment for major depression. The Mercer-Smiths took Rachel to Dr. Beth Reich, who placed Rachel on anti-depressant medication. Rachel's condition began to worsen, however, and the Mercer-Smiths became concerned that she was having suicidal thoughts. The Mercer-Smiths again contacted Dr. Reich, who made arrangements to have Rachel admitted to the psychiatric ward of an area hospital. While in the hospital, Rachel attended group therapy sessions and began taking different medication. Although Rachel denied that she had ever been the victim of sexual abuse, the attending physician recommended that she reside with her nanny because he believed "parental stress might be contributing to [her] condition." Id. at 44. The Mercer-Smiths agreed to this course of action, and in late January 2001, Rachel was released from the psychiatric ward and placed in the custody of her nanny.

On February 7, Rachel's nanny called the Mercer-Smiths and told them that Rachel was having another psychiatric episode. The Mercer-Smiths immediately took Rachel back to Dr. Reich, who discussed with them the 1990 and 1992 allegations of sexual abuse. Dr. Reich then met with Rachel and Julia together and asked them if their father had ever sexually abused them. Rachel and Julia "did not recall any actual sexual abuse." Id. "During the drive home with their

3

nanny, however, the girls[1] . . . became concerned that they may have been sexually abused by [their father] as children." Id. The nanny and the children immediately returned to Dr. Reich's home, where the girls "reported memories . . . that when they were ages four to seven, they would sometimes get into bed at night with [their father] . . . and [he] would touch them all over including their private parts." Id. at 45.

Dr. Reich contacted CYFD that night. A few hours later, at about 3:30 a.m., CYFD representatives went to the Mercer-Smiths' home, spoke with the family, and removed Alison (then eight years old) from the home and placed her with the nanny pending further investigation. On February 20, CYFD officials conducted interviews of all three daughters at a "safe house." There, Julia and Rachel told the medical examiner that their father touched them in inappropriate ways. Alison, however, denied that her father ever engaged in such conduct with her.[2]

In March 2001, Julia was referred to a second psychiatrist, who conducted five therapy sessions with her. He found Julia to be "untruthful and manipulative and did not believe her sexual abuse claims." Id. He was later removed from the

---

[1] The record is not clear on this issue, but it appears that Julia was also living with the nanny during this time.

[2] Shortly after taking Alison to a safe house, CYFD released her to the custody of her parents. Unlike Julia and Rachel, CYFD never obtained custody of Alison.

case by CYFD, and Dr. Reich was reinstated as the girls' psychiatrist. Following additional therapy, Dr. Reich reported that Julia and Rachel recalled memories indicating that they might have been raped by their father.

James Mercer-Smith "categorically denied ever touching any of his daughters in an inappropriate manner." Id. at 46. Nonetheless, James submitted to psychological testing, including an Abel Screen and a Penile Plethysmography. "Neither of these laboratory tests indicated that [James] was sexually attracted to children." Id. In addition, the psychiatrist who examined him concluded that there was no evidence that he suffers from pedophilia.

During the investigation period, CYFD hired an independent psychologist to render an opinion regarding Julia and Rachel's situation. The independent psychologist reviewed Janet's mother's allegations of sexual abuse in 1990 and 1992, each psychiatric evaluation of Julia and Rachel, and the results of James' psychological tests. He also conducted follow-up interviews with every member of the Mercer-Smith family, their nanny, and the other psychologists who worked with them. The independent psychologist ultimately concluded that "except for the claims of [Julia] and [Rachel], there [was] no evidence to support the allegations of sexual abuse" against James Mercer-Smith. Id. He therefore recommended that CYFD "facilitate a process of reconciliation and reunifying the family as soon as possible." Id.

Despite this report, CYFD moved forward with child custody hearings in

5

New Mexico state court, including possible criminal charges against James for child sexual abuse. A few weeks before the hearing, Julia and Rachel's nanny informed the Mercer-Smiths that the girls did not want to testify in court. After being told she would have to testify, Rachel apparently "took a large overdose of ibuprofen requiring her stomach to be pumped at the hospital." Id. at 47. The nanny also told the Mercer-Smiths that she was fearful Julia "might harm herself or run away to avoid testifying." Id.

On August 30, 2001, James Mercer-Smith entered a plea of no-contest to the charge that he "touched his children Julia and Rachel in a way that made them feel uncomfortable and which they reasonably perceived as sexual." ROA Vol. 2, at 36. Janet also entered a plea of no contest on the charge that she "knew or should have known that her husband . . . touched . . . Julia and Rachel in a way that made them feel uncomfortable and which they reasonably perceived as sexual and she did not take reasonable steps to protect [them] . . . from further harm." Id. at 37. The Mercer-Smiths allege they pled no contest to these charges because their daughters did not wish to testify and because a psychologist recommended they not confront the girls on this matter. The state court accepted James and Janet's no-contest pleas, determined that Julia and Rachel were "abused children," and ordered the state to take legal custody of the children "for an indeterminate period [of] up to two years." Id. at 38.

For much of the two year period in which the Mercer-Smiths lost custody

6

of Julia and Rachel, the girls were placed in the Casa Mesita Group Home. Gay Farley, the former executive director of the home, and Jennifer Schmierer, a former counselor at the home, both worked with Julia and Rachel at Casa Mesita. In June 2003, CYFD petitioned the state court to approve a proposed plan to transfer Julia to foster care with the Schmierer family and Rachel to foster care with the Farley family. The Mercer-Smiths opposed this plan because placement with these families would create an improper counselor/patient relationship and because these families were opposed to reunification of the Mercer-Smith family.

The state court denied CYFD's motion in November 2003. The court cited to the Code of Ethics for Occupational and Professional Licensing, Counselors, and Therapists, which provides that "licensed or registered individuals shall not enter into a sexual or other dual relationship with a client." ROA Vol. 1, at 60. The state court concluded that because Gay Farley and Jennifer Schmierer had counseled with Julia and Rachel at the Mesita Group Home, they were not eligible to act as the girls' foster parents. CYFD later obtained the court's consent to place Julia and Rachel in the home of the Ritter family, a family that was willing and able to serve as a foster family for the girls.[3]

Over the next several months, the Mercer-Smiths became suspicious that their daughters were actually living with the Farley and Schmierer families, rather

---

[3] As far as the record indicates, the Mercer-Smiths did not object to having their daughters placed in the Ritters' home.

than with the Ritters. On July 29, 2004, the Mercer-Smiths filed a motion to hold CYFD and a number of its employees in contempt of court for ignoring the state court's order regarding placement of the children. In their motion, the Mercer-Smiths alleged CYFD had "created a sham to mask" the fact that the Farleys and Schmierers were acting as the true foster parents of Rachel and Julia. ROA Vol. 2, at 168.

On January 3, 2008 (more than three years after the Mercer-Smiths filed their contempt motion and after Julia and Rachel attained the age of majority), the state court determined that CYFD had violated the court's order (1) by permitting the Farleys and Schmierers to "continue . . . providing transportation to and from school for the girls, taking Rachel to dance class, and Julia to Santa Fe for her therapy"; and (2) by asking the Ritters to "provide a place for [the girls] to sleep, with minimal oversight required." ROA Vol. 1, at 78. The state court further stated that "[t]he designation by CYFD of the Ritters as 'foster parents' was done deliberately by CYFD for the purposes of concealing from the Court and James and Janet Mercer-Smith the fact that Jennifer and Eric Schmierer served the function of being foster parents for Julia . . . and [that] Gay and Dwain Farley served the function of being foster parents for Rachel." Id. at 87.

*Procedural History*

On April 7, 2009, the Mercer-Smiths filed suit in the district court against CYFD; CYFD employees Deborah Hartz, Mary-Dale Bolson, Dorian Dodson,

8

Rebecca Liggett, Angela Dominguez, Roland Trujillo, Carmella Alcon, Veronica Vallejos, Lou Ann Hoeppner, Teresa Vigil, Flora Aragon, and Kimberly Crespin[4] ("the individual defendants"); and Dr. Beth Reich. The Mercer-Smiths named the individual defendants and Dr. Reich in their individual and official capacities.

The Mercer-Smiths alleged the following claims against all defendants: (1) violation of 42 U.S.C. § 1983 (count I); (2) civil conspiracy under 42 U.S.C. § 1985 (count II); (3) continuing violations under § 1983 and § 1985 (count III); (4) negligence, defamation, malicious abuse of process, professional negligence, and medical malpractice under the New Mexico Tort Claims Act (count IV); state common law claims for intentional infliction of emotional distress, invasion of privacy, defamation, professional negligence, negligence, medical malpractice, and malicious abuse of process (count V); and compensatory and punitive damages (count VI).[5]

On February 8, 2010, the district court granted the individual defendants' Motion for Qualified Immunity and to Dismiss and dismissed counts I, III, IV, and V without prejudice. The district court did so because "[a]ll claims against the State Defendants . . . appear to have expired under the applicable statute of

---

[4] Veronica Vallejos and Lou Ann Hoeppner were never served with process, and they have not made appearances in this case. The parties agree that Vallejos and Hoeppner are now non-parties to this action.

[5] Count VI is the only count the district court did not ultimately dismiss. The parties agree, however, that compensatory and punitive damages are remedies, not causes of action.

9

limitations." ROA Vol. 1, at 239.

Also on February 8, the district court granted Dr. Reich's motion for summary judgment on the Mercer-Smiths' § 1983 claim (counts I and III). The court granted the motion and dismissed these claims with prejudice because (1) the Mercer-Smiths had not brought forth evidence indicating that Dr. Reich violated their § 1983 rights; (2) Dr. Reich is immune from suit; (3) Dr. Reich is not a state actor and therefore not liable under § 1983; and (4) the statute of limitations bars the Mercer-Smiths' § 1983 claim against Dr. Reich. The district court also *sua sponte* dismissed with prejudice the Mercer-Smiths' claims under the New Mexico Tort Claims Act (count IV), and it dismissed without prejudice their claims under New Mexico common law (count V).

The Mercer-Smiths timely appealed the district court's grant of the individual defendants' motion to dismiss and Dr. Reich's motion for summary judgment.

## II

### *Standard of Review*

The court reviews both the grant of a motion to dismiss and the grant of a motion for summary judgment under a *de novo* standard. PJ v. Wagner, 603 F.3d 1182, 1192–93 (10th Cir. 2010); Christy Sports, LLC v. Deer Valley Resort Co., Ltd., 555 F.3d 1188, 1191 (10th Cir. 2009).

*Analysis*

A.   *The Individual Defendants' Motion to Dismiss*

The Mercer-Smiths argue the district court erred in dismissing their § 1983 claim and state claims against the individual defendants. We address the federal claim and the state claims in turn.

1.   *Section 1983*

The district court held that the Mercer-Smiths' § 1983 claim was barred by the statute of limitations. The statute of limitations in a § 1983 claim "is drawn from the personal-injury statute of the state in which the federal district court sits." Mondragon v. Thompson, 519 F.3d 1078, 1082 (10th Cir. 2008). In New Mexico, that statute of limitations is three years. O'Connor v. St. John's College, 290 Fed. App'x. 137, 140 (10th Cir. 2008) (unpublished). The district court held that the statute of limitations had run on the Mercer-Smiths' § 1983 claim because they filed suit on April 7, 2009, but knew of the facts giving rise to their claim against the individual defendants when they filed their motion in 2004 to hold them in contempt. Noting that the Mercer-Smiths' claims in this lawsuit "are based on the same conduct as the[ir] 2004 contempt motion," the district court held that "it [was] clear" the Mercer-Smiths were "fully aware . . . [of the] facts in 2004 . . . that should have put them on notice" regarding their claims. ROA Vol. 1, at 236.

The Mercer-Smiths claim the district court's ruling was incorrect based on

11

the doctrines of (1) accrual, (2) equitable tolling, and (3) continuing violation. We are not persuaded by any of these assertions.

### a. Accrual

"[F]ederal law governs the question of accrual of federal causes of action, and thus, dictates when the statute of limitations begins to run for purposes of § 1983." Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1154 (10th Cir. 1998) (citations omitted). "A civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." Id. (quoting Baker v. Bd. of Regents, 991 F.2d 628, 632 (10th Cir. 1993)). "Since the injury in a § 1983 case is the violation of a constitutional right, such claims accrue when the plaintiff knows or should have known that his or her constitutional rights have been violated." Id. (citations and quotation omitted). "This requires the court to identify the constitutional violation and locate it in time." Id. (citation and quotation omitted).

The Mercer-Smiths argue the district court erred in dismissing their § 1983 claim because the claim did not accrue until 2008 when the state court issued its contempt order, thereby "confirming [that] the family unit had been destroyed by unconstitutional conduct."[6] Aplt. Op. Br. at 31. According to the Mercer-Smiths,

_____

[6] We note that the Mercer-Smiths also claim the district court erred in relying on the substance of their contempt motion to determine that the statute began to run in 2004. According to the Mercer-Smiths, the district court could

(continued...)

12

while they "may have entertained suspicions of misconduct" by the defendants prior to 2008, they were not on notice of such conduct until after the state court issued its order.  Id.

We are not persuaded by this argument because the record indicates the Mercer-Smiths knew of the individual defendants' unlawful actions no later than 2004 and were therefore on notice that their constitutional rights may have been violated.  For one, the very fact that the Mercer-Smiths filed a motion seeking to hold the individual defendants in contempt indicates that they believed the individual defendants were violating the state court's original placement order.  In addition, the factual assertions the Mercer-Smiths make in their contempt motion indicate they knew in 2004 that the Farleys and Schmierers were improperly involved in their daughters' lives.  The Mercer-Smiths cite specific examples in their motion of incidents which caused them to believe the Farleys and

---

[6](...continued)
not properly rely on the contempt motion because they did not attach it to their complaint.  This argument fails.  When a document is "referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy of the court to be considered on a motion to dismiss."  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  The Mercer-Smiths alleged in the complaint that "CYFD's and its agents' conduct continued to be in flagrant violation of the court's orders, resulting in the filing of a contempt motion by the Mercer-Smiths."  ROA, Vol. 1 at 10.  Because the Mercer-Smiths referred to the 2004 contempt motion in their complaint and because the motion is central to the Mercer-Smiths' claims, it was proper for the district court to consider it in ruling on the individual defendants' motion to dismiss.

13

Schmierers were disregarding the state court's order that they not act as the girls' foster parents. For example, the Mercer-Smiths allege that from October to December 2003, Alison would frequently meet her sisters at various restaurants and see Julia arriving and leaving in a car driven by Mr. or Mrs. Schmierer and Rachel arriving and leaving with Mr. or Mrs. Farley. ROA Vol. 2, at 162–63. In addition, the Mercer-Smiths allege that on November 11, they personally saw the Schmierers and Farleys drop off Julia and Rachel at a restaurant to have lunch with Alison. Id. at 162.

The 2004 contempt motion further indicates that the Mercer-Smiths acted affirmatively to confirm their suspicions. First, they allege that James "had a check done" to determine the origins of two unknown phone numbers from which Julia and Rachel's cell phones had been called. Id. at 162–63. According to the Mercer-Smiths, one phone number belonged to Eric Schmierer and the other belonged to Gay Farley. Id. In addition, the Mercer-Smiths hired a private investigator to follow the Schmierers and Farleys. According to the Mercer-Smiths, the private investigator discovered that each morning the Schmierers picked up Julia from the Ritters' house and took her to school, while the Farleys picked up Rachel every morning and took her to school. Id. at 164-66.

In short, the Mercer-Smiths' contempt motion contains so many specific allegations of wrongdoing that it is clear they were on notice in 2004 that the individual defendants violated their constitutional rights. Smith, 149 F.3d at

1154. The Mercer-Smiths allege facts based on their own observations, the work of their private investigator, and statements by their youngest daughter, Alison. Because they were aware of these facts, the Mercer-Smiths cannot reasonably argue that they were not on notice regarding their constitutional claim against the individual defendants until the state court issued its contempt order in 2008.

### b. Equitable Tolling

The Mercer-Smiths also argue that even if the accrual period started prior to 2008, their claims should not be time-barred because of the doctrine of equitable tolling. "[S]tate law governs the application of tolling in a [federal] civil rights action." Alexander v. Oklahoma, 382 F.3d 1206, 1217 (10th Cir. 2004). Under New Mexico law, equitable tolling (also known as fraudulent concealment) tolls the statute of limitations "only when the plaintiff does not discover the alleged [wrong] within the statutory period as a result of the defendant's fraudulent concealment." Tomlinson v. George, 116 P.3d 105, 106 (N.M. 2005). Thus, "if a plaintiff discovers the injury within the time limit, fraudulent concealment does not apply because the defendant's actions have not prevented the plaintiff from filing the claim within the time period and the equitable remedy is not necessary." Id. at 111.

The Mercer-Smiths allege the district court should have applied the doctrine of equitable tolling because they "could . . . prove that they lacked essential information necessary to appreciate the existence and cause of the

15

[defendants'] constitutional violation[s]." Aplt. Op. Br. at 37. We are not persuaded by this argument because the Mercer-Smiths have not specifically alleged that the individual defendants concealed from them the fact that the Farleys and Schmierers were the de facto foster parents for Julia and Rachel. Instead, the Mercer-Smiths simply allege that they did not know of the full effect of the Farleys and Schmierers' actions until 2008, when the state court ruled on their contempt motion. In the absence of an assertion that the defendants fraudulently concealed information from the Mercer-Smiths, equitable tolling does not apply to this case. See Tomlinson, 116 P.3d at 106.

Moreover, even if the individual defendants fraudulently concealed their behavior, the Mercer-Smiths' 2004 contempt motion indicates that they were aware the individual defendants were acting improperly. As noted, the Mercer-Smiths allege that they saw the Farleys and Schmierers dropping their daughters off at a restaurant, that they traced phone calls from the Farleys and Schmierers to their daughters' cell phones, and that their private investigator saw the Farleys and Schmierers pick up the girls from the Ritters' home and take them to school. These allegations are sufficient to indicate that the Mercer-Smiths knew of the individual defendants' unlawful behavior. The doctrine of equitable tolling therefore does not apply to this case. See id. at 111 (a plaintiff cannot claim the benefits of the equitable tolling doctrine if he or she discovers the injury within the statutory time period).

16

#### c. *Continuing Harm*

Finally, the Mercer-Smiths allege the district court erred by declining to apply the doctrine of continuing violations. Under this doctrine, a plaintiff may avoid the statute of limitations when the defendant has acted pursuant to a pattern or longstanding policy or practice of constitutional violations. E.g., Robinson v. Maruffi, 895 F.2d 649, 655 (10th Cir. 1990). The Mercer-Smiths' argument clearly fails because the doctrine of continuing violations does not apply to § 1983 claims. Hunt v. Bennett, 17 F.3d 1263, 1265 (10th Cir. 1994) (holding that the doctrine of continuing violations does not "extend[] . . . to a § 1983 claim"); see also Thomas v. Denny's, Inc., 111 F.3d 1506, 1514 (10th Cir. 1997) (The doctrine of continuing violations applies to Title VII claims because "of the need to file administrative charges," but does not apply to claims that do "not require [the] filing of such charges before a judicial action may be brought.").

#### 2. *State Claims*

In addition to dismissing the Mercer-Smiths' § 1983 claim against the individual defendants, the district court dismissed their state law claims contained in count IV (negligence, defamation, malicious abuse of process, professional negligence, and medical malpractice under the New Mexico Tort Claims Act) and count V (state common law claims for intentional infliction of emotional distress, invasion of privacy, defamation, professional negligence, negligence, medical malpractice, and malicious abuse of process). In dismissing these claims, the

17

district court held that the Mercer-Smiths' state law claims were time-barred under the two and three year[7] statutes of limitations "for the same reasons set forth" in the court's dismissal of the § 1983 claim. ROA Vol. 1, at 238.

We affirm the district court's dismissal of these claims because the latest factual allegation in the Mercer-Smiths' complaint supporting any claim for relief is the allegation that, in 2003, the individual defendants "placed the children with the Farley and Schmierer families in direct violation of the [state court's] order." Id. at 8. Because the Mercer-Smiths knew of these actions prior to filing their contempt motion in 2004, the statute of limitations on each state law claim had clearly run by 2009, when the Mercer-Smiths filed suit. We therefore affirm the district court's dismissal of their state law claims against the individual defendants.

### 3. Leave to Amend

In their response to the individual defendants' motion to dismiss, the Mercer-Smiths stated: "If, for any reason, the court deems the present complaint inadequate, Plaintiffs request thirty (30) days to re-plead." ROA Vol. 1, at 40. The district court did not address this request in its order granting the individual defendants' motion to dismiss: it simply dismissed the relevant claims without

---

[7] The statute of limitations for the Mercer-Smiths' claims in count IV (New Mexico Tort Claims Act) is two years, while the applicable statute of limitations for their claims in count V (New Mexico common law) is three years. See ROA Vol. 1, at 238.

prejudice. The Mercer-Smiths now argue the district erred in not permitting them to amend their complaint. We review the refusal of leave to amend for abuse of discretion. Gohier v. Enright, 186 F.3d 1216, 1218 (10th Cir. 1999).

We conclude that the district court did not abuse its discretion because the Mercer-Smiths did not comply with the District of New Mexico's Local Rules as they relate to amendments of pleadings. As we have previously noted, New Mexico's Local Rules require parties seeking leave to amend to (1) file a motion stating with particularity the grounds for amendment (Rule 7.1); (2) file a separate brief in support of the motion to amend (Rule 7.5); and (3) attach a proposed amended complaint to the motion to amend (Rule 15.1). DeHaan v. United States, 3 Fed. Appx. 729, 731 (10th Cir. 2001) (unpublished). The Mercer-Smiths did not comply with any of these rules; instead, they simply added at the end of their opposition a blanket request for leave to amend if the district court found the complaint to be inadequate. Because the Mercer-Smiths did not properly seek leave to amend, the district court did not abuse its discretion by not granting them leave to amend the complaint. See Garman v. Campbell Cnty. Sch. Dist. No. 1, 630 F.3d 977, 986 (10th Cir. 2010).

The district court also did not err because amendment in this case would be futile. "Although [the Federal Rules] provide[] that leave to amend shall be given freely, the trial court may deny leave to amend where amendment would be futile." Grossman v. Novell, Inc., 120 F.3d 1112, 1126 (10th Cir. 1997). It

19

would be futile to permit the Mercer-Smiths to amend their complaint because amendment will not change the fact that the statute of limitations bars their § 1983 claim and state law claims against the individual defendants. No matter what allegations the Mercer-Smiths add to their amended complaint, the fact remains that they knew of the defendants' alleged unlawful actions when they filed their motion for contempt in 2004. Because amendment cannot cure this statute-of-limitations defect, the district court was not required to permit the Mercer-Smiths to amend their complaint.

B.    *Dr. Beth Reich's Motion for Summary Judgment*

The Mercer-Smiths also claim the district court erred in granting Dr. Reich's motion for summary judgment on their § 1983 claim and in dismissing *sua sponte* their state law claims contained in counts IV and V.

1.    *§ 1983 claim*

The Mercer-Smiths argue the district court should not have granted summary judgment on their § 1983 claim because the evidence indicates that Dr. Reich "set out to deprive them of their constitutional interest in the integrity of their family unit." ROA Vol. 1, at 225. Specifically, the Mercer-Smiths claim Dr. Reich violated their constitutional rights by relying on a "widely discredited" theory regarding recovered memories and by "persist[ing]" with her claims that Julia and Rachel had been sexually abused despite "overwhelming contrary evidence and opinions from her professional colleagues." Id. at 5, 9.

20

We affirm the district court's ruling that the statute of limitations bars the Mercer-Smiths' § 1983 claim against Dr. Reich.[8] As the Mercer-Smiths state in their complaint, Dr. Reich's allegedly unlawful actions—her reckless reliance on a "widely discredited" scientific theory and her persistent allegations against James Mercer-Smith despite "overwhelming evidence" of his innocence—all took place no later than 2002, a full seven years before the Mercer-Smiths filed suit. Morever, the record indicates that the Mercer-Smiths knew of Dr. Reich's allegedly unlawful actions at that time. By 2002, they knew Dr. Reich had reported James' alleged abuse to CYFD, they were aware of the medical foundation upon which Dr. Reich based her expert opinion, and they were aware of the reports of other psychologists who disagreed with Dr. Reich's conclusions. Id. at 46–47, 241. Accordingly, the district court correctly granted Dr. Reich's motion for summary judgment based on her statute of limitations defense.

The Mercer-Smiths argue in their opening brief that, at the very least, a factual question exists regarding whether Dr. Reich engaged in unlawful activity within the limitations period. In support of this assertion, they note that on

[8] We note that the district court also granted Dr. Reich's motion for summary judgment (1) because the Mercer-Smiths failed to raise genuine issues of material fact necessary to defeat summary judgment; (2) because Dr. Reich is immune from suit; and (3) because Dr. Reich cannot be liable as a non-state actor under § 1983. Since we affirm the district court's ruling with respect to the statute of limitations, we do not address the other reasons the district court granted summary judgment on the § 1983 claim.

21

November 6, 2006, CYFD's attorney sent Dr. Reich a subpoena requiring her to testify at a state court hearing regarding custody of Julia and Rachel. Id. at 160. The next day, however, CYFD's attorney faxed Dr. Reich a letter indicating that the subpoena had been sent to her in error and that she would not be needed at the upcoming hearing. Id. at 159.

Despite the Mercer-Smiths' assertions to the contrary, the November 2006 notice of subpoena fails to create a factual dispute regarding the running of the statute of limitations. The fact that CYFD sent Dr. Reich a subpoena (which it later retracted) in 2006 does not reasonably indicate that Dr. Reich was engaged in any sort of improper activity at that time. It is not surprising that Dr. Reich could have been called to testify in 2006—she first contacted CYFD regarding her suspicions that the girls had been sexually abused and she had been deposed in 2002 regarding her professional opinion on this matter. More important, however, is the fact that even if CYFD's 2006 subpoena created some sort of factual dispute regarding the propriety of Dr. Reich's conduct, the statute of limitations still began running no later than 2002 when the Mercer-Smiths learned fully of Dr. Reich's involvement in the state of New Mexico's attempt to obtain custody of their children. Accordingly, we conclude that the district court's decision to grant summary judgment on statute of limitations grounds was correct.

2. *State Claims*

The Mercer-Smiths also appeal the district court's dismissal of their state

22

law claims against Dr. Reich. After granting Dr. Reich's motion for summary judgment on the § 1983 claim, the district court *sua sponte* dismissed the remaining state law claims. The district court dismissed the claims in count IV, which arise out of the New Mexico Tort Claims Act, "given [its] findings" regarding the Mercer-Smiths' § 1983 claim. ROA Vol. 1, at 228. And after dismissing those claims, the district court declined to accept jurisdiction of the New Mexico common law claims in count V and dismissed them for lack of federal jurisdiction.

We affirm the district court's dismissal of the state law claims contained in counts IV and V. As to the claims in count IV, the district court properly dismissed these claims because, like the Mercer-Smiths' § 1983 claim, they arise from Dr. Reich's allegedly improper report of sexual abuse to CYFD and improper medical conclusions, both of which the Mercer-Smiths were aware no later than 2002. Thus, the Mercer-Smiths' knowledge of Dr. Reich's actions bar not only her § 1983 claim, but also her state law claims contained in count IV.

We also affirm the district court's refusal to accept jurisdiction of the state law claims in count V. Because the district court had previously dismissed the Mercer-Smiths' § 1983 and §1985 claims against Dr. Reich, federal question jurisdiction in this case was lacking. Further, because all involved parties in this case are citizens of New Mexico, diversity jurisdiction in this case does not exist. Accordingly, the district court was within its discretion to decline supplemental

23

jurisdiction[9] on the remaining state law claims and dismiss them for lack of

subject matter jurisdiction.

### III

The judgment of the district court is AFFIRMED.


                                    Entered for the Court


                                    Mary Beck Briscoe
                                    Chief Judge

---

[9] We note that the district court could have also dismissed the state law claims in Count IV for lack of federal jurisdiction.